UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

ABBVIE INC., *et al.*,

                          *Plaintiffs,*

   v.

GENTNER DRUMMOND, in his official
capacity as ATTORNEY GENERAL OF
OKLAHOMA,

                         *Defendant.*

No.  5:25-cv-726-PRW

## THE STATE OF OKLAHOMA'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

GARRY M. GASKINS, II, OBA 20212
  *Solicitor General*
ZACH WEST, OBA 30768
  *Director of Special Litigation*

OFFICE OF ATTORNEY GENERAL
  STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
Phone: (405) 521-3921
Garry.Gaskins@oag.ok.gov
Zach.West@oag.ok.gov

WILL FLANAGAN, OBA 35110
  *Assistant Solicitor General*
ADDISON GAUT, OBA 36457
  *Assistant Attorney General*

OFFICE OF ATTORNEY GENERAL
  STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
Phone:  (405) 521-3921
William.Flanagan@oag.ok.gov
Addison.Gaut@oag.ok.gov

*Counsel for Defendant*

August 21, 2025

## TABLE OF CONTENTS

INTRODUCTION...........................................................................................................1

BACKGROUND............................................................................................................2

    A.  The creation of the 340B Program .............................................................2

    B.  HHS guidance letters ...................................................................................5

    C.  Accounting models for distribution............................................................6

    D.  Resulting litigation ......................................................................................7

    E.  States' responses .........................................................................................7

    F.  Oklahoma law .............................................................................................8

    G.  The present lawsuit .....................................................................................9

ARGUMENT AND AUTHORITIES ...........................................................................9

    I.  PLAINTIFFS CANNOT DEMONSTRATE LIKELY SUCCESS ON THE MERITS.......10

    A.  HB 2048 is not preempted. ......................................................................10

    B.  Congress has not preempted the field. .....................................................12

    C.  HB 2048 does not conflict with federal law.............................................15

    II.  HB 2048 IS NOT AN UNCONSTITUTIONAL TAKING. ...................................18

    A.  HB 2048 is not vague..............................................................................21

    III.  THE OTHER EQUITABLE FACTORS COUNSEL AGAINST
        INJUNCTIVE RELIEF. ..............................................................................24

CONCLUSION ............................................................................................................25

# TABLE OF AUTHORITIES

## Cases

*Abbott Lab'ys. v. Portland Retail Druggists Ass'n, Inc.*,
    425 U.S. 1 (1976).................................................................................................7

*Abbott v. Perez*,
    585 U.S. 579 (2018)..........................................................................................24

*AbbVie Inc. v. Bailey*,
    No. 4:24-cv-996, 2025 WL 1918948 (E.D. Miss. July 11, 2025) ............... 8, 18, 20

*AbbVie Inc. v. Fitch*,
    No. 1:24-CV-184-HSO-BWR, 2024 WL 3503965 (S.D. Miss. July 22, 2024) ...8, 12, 14, 19, 20, 21

*AbbVie Inc. v. Skrmetti*,
    No. 3:25-CV-00519, 2025 WL 1805271 (M.D. Tenn. June 30, 2025)....8, 12, 14, 17, 18, 19, 20, 23, 24

*Am. Hosp. Ass'n v. Becerra*,
    596 U.S. 724 (2022)............................................................................................3

*Arizona v. United States*,
    567 U.S. 387 (2012)....................................................................................12, 13

*Astra USA, Inc. v. Santa Clara Cnty.*,
    563 U.S. 110 (2011)......................................................................................2, 16

*AstraZeneca Pharm. LP v. Fitch*,
    766 F. Supp. 3d 657 (S.D. Miss. 2024)..............................................................8, 19

*California v. ARC Am. Corp.*,
    490 U.S. 93 (1989)............................................................................................11

*Carolina Youth Action Project v. Wilson*,
    60 F.4th 770 (4th Cir. 2023) .........................................................................23, 24

*Cedar Point Nursery v. Hassid*,
    594 U.S. 139 (2021)..........................................................................................19

*Cipollone v. Liggett Grp., Inc.*,
    505 U.S. 504 (1992)..........................................................................................11

*Cramp v. Bd. of Pub. Instruction*,
    368 U.S. 278 (1961)..........................................................................................22

*DeCanas v. Bica*,
    424 U.S. 351 (1976)..........................................................................................12

*Eli Lilly & Co. v. Kennedy*,
    No. 24-cv-03220, 2025 WL 1423630 (D.D.C. May 15, 2025) ................................6

iii

*Fla. Lime & Avocado Growers, Inc. v. Paul*,
    373 U.S. 132 (1963) ..............................................................................12

*Genesis Health Care, Inc. v. Becerra*,
    701 F. Supp. 3d 312 (D.S.C. 2023) ........................................................4

*Haw. Hous. Auth. v. Midkiff*,
    467 U.S. 229 (1984) ..............................................................................21

*Hejira Corp. v. MacFarlane*,
    660 F.2d 1356 (10th Cir. 1981) ............................................................22

*Hillsborough Cnty. v. Automated Med. Labs., Inc.*,
    471 U.S. 707 (1985) ....................................................................... 11, 12

*Horne v. Dep't of Agric.*,
    576 U.S. 350 (2015) ....................................................................... 20, 21

*Jordan v. De George*,
    341 U.S. 223 (1951) ..............................................................................22

*Kelo v. City of New London*,
    545 U.S. 469 (2005) ....................................................................... 19, 21

*Los Alamos School Bd. v. Wugalter*,
    557 F.2d 709 (10th Cir. 1977) ..............................................................15

*Mazurek v. Armstrong*,
    520 U.S. 968 (1997) ..............................................................................10

*Minn. Ass'n of Health Care Facilities v. Minn Dep't of Pub. Welfare*,
    742 F.2d 442 (8th Cir. 1984) ................................................................20

*Moody v. NetChoice, LLC*,
    603 U.S. 707 (2024) ..............................................................................10

*Mount Olivet Cemetery Ass'n v. Salt Lake City*,
    164 F.3d 480 (10th Cir. 1998) ..............................................................11

*Munaf v. Geren*,
    553 U.S. 674 (2008) ................................................................................9

*Novartis Pharms. Corp. v. Johnson*,
    102 F.4th 452 (D.C. Cir. 2024) ......................................... 3, 4, 5, 7, 13, 16

*Oneok, Inc., v. Learjet, Inc.*,
    575 U.S. 373 (2015) ................................................................... 10, 11, 15

*Parker v. Brown*,
    317 U.S. 341 (1943) ..............................................................................10

*Paul v. Monts*,
    906 F.2d 1468 (10th Cir. 1990) ............................................................15

*PCMA v. Wehbi,*
   18 F.4th 956 (8th Cir. 2021) ...................................................................................12

*Pharm. Rsch. & Mfrs. of Am. v. Bailey,*
   No. 2:24-CV-04144-MDH, 2025 WL 644281 (W.D. Mo. Feb. 27, 2025) ............................8

*Pharm. Rsch. & Mfrs. of Am. v. Fitch,*
   No. 1:24-cv-160-HSO-BWR, 2024 WL 3277365 (S.D. Miss. July 1, 2024) ................... 8, 18

*Pharm. Rsch. & Mfrs. of Am. v. McClain,*
   95 F.4th 1136 (8th Cir. 2024) ....................................................8, 12, 13, 15, 16, 18, 20

*Pharm. Rsch. & Mfrs. of Am. v. Morrisey,*
   760 F. Supp. 3d 439 (S.D.W.V. 2024) ............................................................... 8, 14

*Pharm. Rsch. & Mfrs. of Am. v. Murrill,*
   No. 6:23-CV-00997, 2024 WL 4361597 (W.D. La. Sept. 30, 2024) ......... 8, 18, 19, 20, 22, 23

*Poe v. Drummond,*
   No. 23-5110, 2025 WL 2238038 (10th Cir. Aug. 6, 2025) .....................................10

*Powerex Corp. v. Reliant Energy Servs., Inc.,*
   551 U.S. 224 (2007)...........................................................................................23

*Rosenstiel v. Rodriguez,*
   101 F.3d 1544 (8th Cir. 1996) ..............................................................................15

*Ruckelshaus v. Monsanto Co.,*
   467 U.S. 986 (1984)...............................................................................19, 20, 21

*Salt Lake Trib. Pub. Co. v. AT&T Corp.,*
   320 F.3d 1081 (10th Cir. 2003) ............................................................................10

*Sanofi Aventis U.S. LLC v. HHS,*
   58 F.4th 696 (3d Cir. 2023)...........................................................................2, 15, 16

*Sanofi-Aventis U.S., LLC v. HHS,*
   570 F. Supp. 3d 129 (D.N.J. 2021) .........................................................................3

*Tarrant Reg'l Water Dist. v. Herrmann,*
   656 F.3d 1222 (10th Cir. 2011) ............................................................................11

*United States v. Hansen,*
   599 U.S. 762 (2023)...........................................................................................10

*United States v. Salerno,*
   481 U.S. 739 (1987)...........................................................................................10

*United States v. Solomon,*
   95 F.3d 33 (10th Cir. 1996).................................................................................22

*Valancourt Books v. Garland,*
   82 F.4th 1222 (D.C. Cir. 2023)............................................................................20

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.,*
    455 U.S. 489 (1982)................................................................................22

*Winter v. Natural Res. Def. Council, Inc.,*
    555 U.S. 7 (2008)...................................................................................9

## Statutes

42 U.S.C. § 1396r-8 ...................................................................................2

42 U.S.C. § 256b ...............................................2, 3, 4, 5, 7, 12, 13, 16, 17

OKLA. STAT. tit. 36, § 5401, *et seq.*....................................8, 9, 13, 20, 22, 23, 24

## Rules and Regulations

42 C.F.R. § 10.10(b) (March 6, 2017)..........................................................3

59 Fed. Reg. 25,110 (May 13, 1994).............................................................5

61 Fed. Reg. 43,549 (Aug. 23, 1996) .......................................................5, 17

75 Fed. Reg. 10,272 (Mar. 5, 2010) ........................................................6, 18

82 Fed. Reg. 1210 (Jan. 5, 2017)................................................................3

## Other Authorities

340B INFORMED, *Keeping Rural Hospitals Open is a Key Part of 340B*
    (Mar. 7, 2019) ....................................................................................3

Alaa Ziad Haidar, *Recent 340b Contract Pharmacy Troubles and the Necessary Solution,*
    33 HEALTH LAW. 34 (2020) ...................................................................25

GOV'T ACCOUNTABILITY OFF., *Drug Pricing: Manufacturer Discounts in the 340B Program Offer*
    *Benefits, but Federal Oversight Needs Improvement*
    17–18 (GAO-11-836, Sept. 2011)............................................................4

Joel M. Hamme, *et al.,*
    2 HEALTH L. PRAC. GUIDE § 26A:20 (2024) ...........................................7

Nicholas C. Fisher, *The 340B Program: A Federal Program in Desperate Need of Revision After Two-*
    *And-A-Half Decades of Uncertainty,*
    22 J. HEALTH CARE L. & POL'Y 25 (2019) .............................................2

**INTRODUCTION**

Drug manufacturers that choose to participate in Medicare Part B and Medicaid must also participate in the 340B Drug Pricing Program ("340B Program" or "Program"), which requires manufacturers to provide a discount to certain healthcare providers. Many of those covered providers choose to contract with pharmacies to provide patients with prescriptions. Under the terms of those contracts, the providers can receive the Program discount for prescriptions filled in the contracted pharmacies. Five years ago, however, manufacturers began to restrict the number of contracted pharmacies where patients can receive 340B discounted drugs. Numerous states have pushed back. Oklahoma enacted House Bill 2048 ("HB 2048"), which prohibits manufacturers from limiting covered entities in Oklahoma from contracting with outside pharmacies to provide their patients with 340B discounted drugs.

With the enactment of HB 2048, AbbVie and its fellow manufacturers have lost a policy debate. Now, AbbVie asks this Court to override the democratic process. Although the administration of healthcare service is complex, the core of this case is simple. Both parties agree that the federal statute governing the 340B Program is completely silent as to the delivery of 340B discounted drugs. Because federal law is silent in an area of law traditionally left to the states, Oklahoma's regulation of *where* manufacturers must deliver 340B drugs is not preempted, as numerous courts have found. Similarly, HB 2048 does not violate the Takings Clause because it merely regulates contractual relationships that AbbVie voluntarily entered. And HB 2048's meaning is readily ascertainable, not unconstitutionally vague. In the end, this Court should deny AbbVie's effort to block enforcement of a state law that will help Oklahoma's underserved citizens obtain vital health care services and prescription drugs.

1

## BACKGROUND

### A. The creation of the 340B Program

In 1992, Congress established the 340B Program as part of the Veterans Health Care Act, and Congress amended it in 2010 as part of the Affordable Care Act. *Sanofi Aventis U.S. LLC v. HHS*, 58 F.4th 696, 699 (3d Cir. 2023). The Program was meant to address an "unintended consequence" of the Medicaid Drug Rebate Program (enacted in 1990) that accidentally ended the common manufacturer practice of giving discounts to hospitals and safety-net providers. Nicholas C. Fisher, *The 340B Program: A Federal Program in Desperate Need of Revision After Two-and-a-Half Decades of Uncertainty*, 22 J. HEALTH CARE L. & POL'Y 25, 28–30 (2019). Congress was unwilling to "continue to allow" these vulnerable populations "to remain unprotected against manufacturer price increases." H.R. REP. 102-384, at 11. Thus, it created the 340B Program as a means "to stretch scarce Federal resources as far as possible." *Id.* at 12. This Program allows covered entities to access discounts to "reach[] more eligible patients and provid[e] more comprehensive services." *Id.* In sum, the Program protects the longstanding practice of providing discounted drugs to providers serving vulnerable populations.

The 340B Program is based on a voluntary "opt-in mechanism." *Astra USA, Inc. v. Santa Clara Cnty.*, 563 U.S. 110, 115 (2011). To voluntarily access the Medicare Part B and Medicaid markets, drug makers "must offer their drugs at a discount to certain healthcare providers." *Id.* (citing 42 U.S.C. §§ 256b, 1396r-8(a)(1), (5)). The discount for those drugs is established by statute and implemented through agreements between the Secretary of Health and Human Services ("HHS") and each drug manufacturer that cap prices for "covered outpatient drugs." 42 U.S.C. § 256b(a)(1). The amount of this discount varies, but "the average

discount rate appears to be between 25 and 50 percent.*" Sanofi-Aventis U.S., LLC v. HHS*, 570 F. Supp. 3d 129, 208 (D.N.J. 2021), *aff'd in part, rev'd in part on other grounds*, 58 F.4th at 696.[1]

Providers in the 340B Program are called "covered entities," and they typically serve "low-income and rural persons." *Sanofi*, 58 F.4th at 699. "Covered entities" must meet narrow statutory categories such as "rural referral centers[] and hospitals that primarily serve low-income patients." *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 456 (D.C. Cir. 2024) (citing 42 U.S.C. § 256b(a)(4)). Unsurprisingly, these types of healthcare providers are less profitable than providers that cater mostly to affluent patients. If left exclusively to market whims, the number of covered entities would dwindle—decreasing the healthcare services available to the impoverished and rural. In 2017, 74% of rural hospitals reported that they used savings from the 340B Program to keep their doors open. 340B INFORMED, *Keeping Rural Hospitals Open is a Key Part of 340B* (Mar. 7, 2019).[2] As the Supreme Court put it, "340B hospitals perform valuable services for low-income and rural communities but have to rely on limited federal funding for support." *Am. Hosp. Ass'n v. Becerra*, 596 U.S. 724, 738 (2022).

The 340B Program allows covered entities to provide these critical services in several ways. First, the Program grants them extra revenue: "they turn a profit when insurance companies reimburse them at full price for drugs that they bought at the 340B discount." *Sanofi*, 58 F.4th at 699. Second, it enables them to provide steep discounts to uninsured patients. *See* GOV'T ACCOUNTABILITY OFF., *Drug Pricing: Manufacturer Discounts in the 340B*

---

[1] AbbVie mentions the possibility of these drugs costing just a penny after the 340B Program discount, but that is misleading. See Okla. Resp., Doc. 14, *Novartis v. Drummond*, No. 25-cv-727, at 3 n.1.

[2] *Available at* https://tinyurl.com/340Binformed (last accessed Aug. 14, 2025).

*Program Offer Benefits, but Federal Oversight Needs Improvement* 17–18 (GAO-11-836, Sept. 2011). The extra revenue helps make covered entities "profitable," thereby "stretch[ing] scarce [f]ederal resources as far as possible" to "provide more services to a larger population of under-served patients." *Genesis Health Care, Inc. v. Becerra*, 701 F. Supp. 3d 312, 316 (D.S.C. 2023) (quoting H.R. Rep. 102-384(II), at 12 (1992)). The Program allows covered entities to expand capacity, and it incentivizes the creation of more entities to serve the underserved.

Congress limited the Program in key respects. First, Congress defined "covered entities" narrowly. 42 U.S.C. § 256b(a)(4). Second, covered entities are prohibited from "resell[ing] or otherwise transfer[ring] the drug to a person who is not a patient of the entity"— a practice referred to as "diversion." *Novartis*, 102 F.4th at 456. Third, manufacturers are protected from having to provide both a 340B discount and a Medicaid rebate. Covered entities must assist the Health Resources & Services Administration ("HRSA") in ensuring that this does not happen. *Id.* In short, the Program discounts only apply to patients of covered entities, and states are not allowed to add a Medicaid rebate on top of the 340B discount.

Congress also created compliance measures. Both manufacturers and the Secretary of HHS may audit covered entities. 42 U.S.C. § 256b(a)(5)(C). If the Secretary finds that the covered entity illegally resold discounted drugs or did not take the steps needed to prevent duplicate discounts, the Secretary may require a covered entity to pay "a monetary penalty to a manufacturer"—and in extreme cases even kick the covered entity out of the 340B Program. *Id.* § 256b(d)(2)(B)(v)(I), (II). And when a dispute arises between covered entities and manufacturers about pricing, payment, diversion, or double-discounting, the 340B Program requires an "[a]dministrative dispute resolution process." *Id.* § 256b(d)(3). To use that process,

manufacturers must first audit a covered entity. The administrative resolution of those claims constitutes "a final agency decision" that is subject to judicial review. *Id.* § 256b(d)(3)(C).

In sum, the federal statute governing the 340B Program provides for the scope of covered entities, the discounts they receive, and certain compliance measures. It does not speak to how or where covered entities may receive the covered drugs.

## B. HHS guidance letters

At times, HHS has sought to fill this statutory gap. While the HHS Secretary lacks rulemaking authority over most aspects of the 340B Program, HRSA has issued three guidance letters that "address the distribution of drugs from manufacturers to covered entities." *Novartis*, 102 F.4th at 456. Those letters evolved with the shifting landscape of prescription drugs. In 1992, HRSA indicated that covered entities may use a "purchasing agent" to access covered drugs. Final Notice Regarding Section 602 of the Veterans Health Care Act of 1992 Entity Guidelines, 59 Fed. Reg. 25,110, 25,113 (May 13, 1994). Per the guidance, "manufacturers may ship discounted drugs to this agent, which then must ship them to the covered entity for dispensing to patients." *Novartis*, 102 F.4th at 456. Then, in 1996, HRSA "stated that a covered entity without an in-house pharmacy may contract with a single outside pharmacy to dispense drugs at a single location." *Id.* at 457 (citing 1996 Guidance at 43,555). HRSA noted that if covered entities could not use outside pharmacies, they would face the "untenable dilemma" of choosing to invest in in-house pharmacies—"impossible" for many—or leaving the 340B Program. Notice Regarding Section 602 of the Veterans Health Care Act of 1992; Contract Pharmacy Services, 61 Fed. Reg. 43,549, 43,550 (Aug. 23, 1996) ("1996 Guidance"). Finally, in 2010, HRSA opined that covered entities may contract with an

unlimited number of outside pharmacies, regardless of whether the entities had in-house pharmacies. Notice Regarding 340B Drug Pricing Program—Contract Pharmacy Services, 75 Fed. Reg. 10,272, 10,272–73 (Mar. 5, 2010); *Novartis*, 102 F.4th at 457.

### C. Accounting models for distribution

Over the years, the model for distributing and tracking 340B Program drugs evolved. When a 340B hospital relies on a contract pharmacy, it often relies on the "replenishment model." *Eli Lilly & Co. v. Kennedy*, No. 24-cv-03220, 2025 WL 1423630, at *2 (D.D.C. May 15, 2025). In this model, a covered entity establishes a relationship with a pharmacy. Consider, for example, hypothetical Drug A. The contract pharmacy dispenses prescriptions of Drug A from its general inventory of drugs for which it paid the manufacturer full price. *Id.* The 340B hospital or its third-party administrator then employs software that compares information from the pharmacy with information from the covered entity to identify 340B-eligible patients who purchased Drug A from the pharmacy in connection with their care at the covered entity. *Id.* at *3. Once a full package of Drug A has been dispensed to covered entity patients at the pharmacy, the covered entity then purchases an order of Drug A at the 340B discounted price to replenish the pharmacy's stock. *Id.* While the drugs are sold at the pharmacy, it is the covered entity that purchases the drugs at the 340B price, and the covered entity only receives that price for the number of its patients who purchased Drug A. Ex. 6, Dr. Wallack Report, at 5.

The replenishment model allows a pharmacy to dispense a drug from its inventory to a covered entity's patient instead of having to wait on orders of 340B Program discounted drugs to arrive. Otherwise, the pharmacy would have to maintain two separate inventories of drugs: one for patients from covered entities and another for other patients. Such a practice is

"very burdensome for many covered entities." Joel M. Hamme *et al.*, 2 HEALTH L. PRAC. GUIDE § 26A:20 (2024). Like under any model, the covered entity must ensure that it only receives the Program discount for sales of drugs to its patients. And HHS audits covered entities to ensure that they and their pharmacies are complying. 42 U.S.C. § 256b(a)(5)(C). A similar model was endorsed by the Supreme Court in the face of drug manufacturers' claims that it was unworkable and caused excessive retroactive exposure to claims. *Abbott Lab'ys v. Portland Retail Druggists Ass'n, Inc.*, 425 U.S. 1, 19–20 (1976).

### D. Resulting litigation

About five years ago, manufacturers decided they would no longer agree to covered entities' use of multiple contract pharmacies. They incorrectly claimed "contract pharmacies were driving up duplicate discounting and diversion." *Sanofi*, 58 F.4th at 700. Manufacturers began to limit the covered entities' use of contract pharmacies. For example, AbbVie only allows covered entities that lack an in-house pharmacy to use one contract pharmacy and only if it submits claims data. Doc. 7 at 5. HHS took action to prohibit those policies. *Sanofi*, 58 F.4th at 701. In the resulting litigation, the Third Circuit and D.C. Circuit both held that the text of Section 340B is "silent about delivery." *Id.* at 703; *Novartis*, 102 F.4th at 460. Thus, the courts held that the statute itself does not "requir[e] delivery of discounted drugs to an unlimited number of contract pharmacies." *Sanofi*, 58 F.4th at 706.

### E. States' responses

As manufacturers began to impose policies limiting covered entities' ability to contract with outside pharmacies, "covered entities dependent on contract pharmacies [became] unable to serve patients in need." *Pharm. Rsch. & Mfrs. of Am. v. McClain*, 95 F.4th 1136, 1139 (8th Cir.

2024). Thus, many states enacted legislation that "prohibits manufacturers from limiting covered entities' ability to contract with outside pharmacies." *Id.* In response, drug companies have filed lawsuits across the country challenging these laws. And across the country, the manufacturers have lost. Repeatedly. *See, e.g.*, *McClain*, 95 F.4th at 1146.[3]

### F. Oklahoma law

Manufacturers' restrictions on contract pharmacies were soon felt in Oklahoma. For example, Stillwater Medical Center Authority has lost over $3 million annually based on new manufacturer policies. Ex. 2, Decl. of Alan Lovelace, ¶ 7. They are not alone. Ex. 4, Decl. of Dana Berryhill, ¶ 6 (DRH Health has lost over $10 million in 340B savings benefits since the manufacturers restricted contract pharmacies). This decline has occurred while uncompensated care has remained the same—upending the Program that has increased health care capacity in rural Oklahoma. As a result, multiple Oklahoma hospitals and primary care providers faced the possibility of closing clinics and services. Ex. 2, ¶ 7. In response, Oklahoma enacted its own version of the contract pharmacy laws now seen nationwide.

Codified at OKLA. STAT. tit. 36, § 5401, *et seq.*, HB 2048 states that "[a] manufacturer shall not deny, restrict, prohibit, or otherwise interfere with, either directly or indirectly, the acquisition of a 340B drug by, or delivery of a 340B drug to a 340B entity, unless such receipt

---

[3] *See also Pharm. Rsch. & Mfrs. of Am. v. Fitch*, No. 1:24-cv-160-HSO-BWR, 2024 WL 3277365, at *12 (S.D. Miss. July 1, 2024) (*Fitch I*); *AbbVie v. Fitch*, No. 1:24-CV-184-HSO-BWR, 2024 WL 3503965, at *9 (S.D. Miss. July 22, 2024) (*Fitch II*); *AstraZeneca Pharm. LP v. Fitch*, 766 F. Supp. 3d 657, 660 (S.D. Miss. 2024) (*Fitch III*); *Pharm. Rsch. & Mfrs. of Am. v. Bailey*, No. 2:24-CV-04144-MDH, 2025 WL 644281, at *3 (W.D. Mo. Feb. 27, 2025); *AbbVie Inc. v. Skrmetti*, No. 3:25-CV-00519, 2025 WL 1805271, at *19 (M.D. Tenn. June 30, 2025); *Pharm. Rsch. & Mfrs. of Am. v. Murrill*, No. 6:23-CV-00997, 2024 WL 4361597, at *15 (W.D. La. Sept. 30, 2024). *But see Pharm. Rsch. & Mfrs. of Am. v. Morrisey*, 760 F. Supp. 3d 439, 446 (S.D.W.V. 2024).

is prohibited by [HHS]." *Id.* § 5403(A). Similarly, "[a] manufacturer shall not interfere with a pharmacy contracted with a 340B entity." *Id.* § 5403(B). Together, these provisions prohibit manufacturers from stopping covered entities in Oklahoma from contracting with pharmacies to provide their patients 340B drugs. HB 2048 also protects covered entities from being subject to onerous conditions to receive 340B drugs at contract pharmacies. *Id.* § 5402.

Enforcement of HB 2048 is split between the Oklahoma Insurance Department and the Oklahoma Attorney General. *Id.* § 5404. The Attorney General may establish rules and regulations interpreting HB 2048, and he may impose civil fines up to $10,000 for each violation. *Id.* § 5404(B). AbbVie repeatedly raises the specter of criminal liability, *e.g.*, Doc. 16 at 13, but nothing in HB 2048 grants the Attorney General authority to seek criminal penalties.

### G. The present lawsuit

Here, AbbVie alleges that HB 2048 is preempted, constitutes an unlawful taking, and is unconstitutionally vague. As numerous courts have already decided, however, these claims fail. For the reasons provided below, this Court should deny AbbVie a preliminary injunction.

## ARGUMENT AND AUTHORITIES

"A preliminary injunction is an extraordinary and drastic remedy . . . it is never awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008) (cleaned up). A claimant "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (citations omitted). "[T]he right to relief must be clear and unequivocal." *Poe v. Drummond*, 2025 WL 2238038, at *2 (10th Cir. Aug. 6, 2025) (citation omitted). An injunction "should not

be granted unless the movant, *by a clear showing*, carries the burden of persuasion" on each element. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (quotation omitted). Put simply, an injunction is "the exception rather than the rule." *Id.* at 797 (quotation omitted).

The burden is even higher when, like here, a plaintiff facially challenges the law. Because "'facial challenges threaten to short circuit the democratic process' by preventing duly enacted laws from being implemented in constitutional ways[,]" the Supreme Court has "made facial challenges hard to win." *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024) (citation omitted). Indeed, to prevail on a facial challenge, a plaintiff must normally show "that *no set of circumstances* exists under which" the challenged statute can be constitutionally applied. *United States v. Hansen*, 599 U.S. 762, 769 (2023) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). Because AbbVie cannot meet this burden, its motion should be denied.

## I. PLAINTIFFS CANNOT DEMONSTRATE LIKELY SUCCESS ON THE MERITS.

On the merits, a plaintiff must "present 'a prima facie case showing a reasonable probability that [it] will ultimately be entitled to the relief sought.'" *Salt Lake Trib. Pub. Co. v. AT&T Corp.*, 320 F.3d 1081, 1100 (10th Cir. 2003) (citation omitted). That has not happened.

### A. HB 2048 is not preempted.

Under the Supremacy Clause, "the Laws of the United States" take priority over conflicting state laws. U.S. CONST. art. VI, cl. 2. But "the states are sovereign, save only as Congress may constitutionally subtract from their authority." *Parker v. Brown*, 317 U.S. 341, 351 (1943). Congress can preempt state laws in several ways. The simplest way is "through express language in a statute." *Oneok, Inc., v. Learjet, Inc.*, 575 U.S. 373, 376 (2015). Critically, AbbVie has not pointed to any express preemption language here.

10

When a statute does not refer to preemption, a plaintiff must demonstrate that Congress "implicitly pre-empt[ed]" the state law. *Id.* That can be done through either field preemption or conflict preemption. *Id.* at 376–77. Field preemption occurs only when "Congress has forbidden the State to take action in the field that the federal statute pre-empts." *Id.* Conflict preemption occurs when "compliance with both state and federal law is impossible," or when the State law is "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *California v. ARC Am. Corp.*, 490 U.S. 93, 100–01 (1989) (citation omitted). The party asserting preemption "bears the burden of showing with specificity that Congress intended to preempt state law." *Mount Olivet Cemetery Ass'n v. Salt Lake City*, 164 F.3d 480, 489 n.4 (10th Cir. 1998).

Because preemption intrudes on the States' sovereign ability to govern, any preemption analysis "start[s] with the assumption that the historic police powers of the States [are] not to be superseded by . . . [a] Federal Act unless that [is] the clear and manifest purpose of Congress." *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992) (citation omitted). This presumption applies particularly to "state or local regulation of matters related to health and safety." *Hillsborough Cnty. v. Automated Med. Lab'ys, Inc.*, 471 U.S. 707, 715 (1985). As a result, the Tenth Circuit "is especially reluctant to find preemption in matters of longstanding state regulation." *Tarrant Reg'l Water Dist. v. Herrmann*, 656 F.3d 1222, 1242 (10th Cir. 2011).

HB 2048 prohibits manufacturers from refusing to deliver 340B discounted drugs to contract pharmacies, in order "to maximize covered-entity patients' access to drugs for which the manufacturers have already agreed to provide a discount." *AbbVie Inc. v. Fitch*, No. 1:24-CV-184, 2024 WL 3503965, at *9 (S.D. Miss. July 22, 2024) (*Fitch II*). By regulating the

distribution of drugs to pharmacies, the law affects "the practice of pharmacy" which "is an area traditionally left to state regulation." *PCMA v. Wehbi*, 18 F.4th 956, 972 (8th Cir. 2021). Plainly then, HB 2048 regulates "matters related to health and safety." *Hillsborough Cnty.*, 471 U.S. at 715. AbbVie has not attempted to argue otherwise. When faced with similar statutes, courts have applied the presumption against preemption. *McClain*, 95 F.4th at 1143; *Fitch II*, 2024 WL 3503965, at *9; *AbbVie Inc. v. Skrmetti*, No. 3:25-CV-00519, 2025 WL 1805271, at *12 (M.D. Tenn. June 30, 2025). This Court should do the same.

**B. Congress has not preempted the field.**

Field preemption requires "a demonstration that complete ouster of state power including state power to promulgate laws not in conflict with federal laws was the clear and manifest purpose of Congress." *DeCanas v. Bica*, 424 U.S. 351, 357 (1976), *superseded by statute on other grounds as recognized in Arizona v. United States,* 567 U.S. 387, 404 (2012). Nothing less than an "unambiguous congressional mandate" will support field preemption. *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 147 (1963). No court analyzing similar state laws has held that such a law is field preempted. Needless to say, AbbVie faces an extremely high burden to show field preemption.

Start with the text of the 340B Program statute. The Program regulates the price paid by certain healthcare providers to receive drugs for their patients. More specifically, it caps the price that participating manufacturers may "offer" covered entities, 42 U.S.C. § 256b(a)(1), and then it imposes requirements on those entities, *id.* § 256b(a)(5). Those requirements include a prohibition on diversion as well as a prohibition on duplicate discounts. *Id.* § 256b(a)(5)(A), (B). To enforce those requirements, the statute provides for audits and grants

the HHS Secretary the ability to impose monetary penalties. *Id.* § 256b(a)(5)(C), (D). Thus, the statute addresses the field of drug pricing—at least in relation to certain healthcare providers, drugs, and manufacturers. It does not even fully occupy that field.

The 340B Program is "silent about delivery conditions." *Novartis*, 102 F.4th at 460; *Sanofi*, 58 F.4th at 703. And HB 2048 merely regulates the delivery of drugs. Specifically, it prohibits manufacturers from "deny[ing], restrict[ing], prohibit[ing], or otherwise interfer[ing] with . . . the acquisition of a 340B drug . . . or [the] delivery" of said drug. OKLA. STAT. tit. 36, § 5403(A). It also states that "[a] manufacturer shall not interfere with a pharmacy contracted with a 340B entity." *Id.* § 5403(B). In effect, HB 2048 ensures that covered entities can contract with outside pharmacies and receive the covered drugs at those pharmacies. Oklahoma law does not regulate or affect the price of drugs at all. *See McClain*, 95 F.4th at 1145. It certainly does not interfere with the discount rates set under the 340B Program. HB 2048 is merely concerned with ensuring that the covered entity can receive covered drugs at locations accessible to their patients. Oklahoma has not "enter[ed] . . . an area the Federal Government has reserved for itself." *Arizona*, 567 U.S. at 402. Accordingly, HB 2048 is not field preempted.

AbbVie's assertion that the Program is so "comprehensive" that any state regulation touching on it "unlawfully encroaches" on a federally preempted field cannot be reconciled with the Program's text. Doc. 7 at 10. As the Eighth Circuit found, "[p]harmacies have always been an essential part of the 340B Program" and yet "the text of 340B is 'silent about delivery' of drugs to patients." *McClain*, 95 F.4th at 1143 (citation omitted). This silence—combined with "the practice of pharmacy [being] an area traditionally left to state regulation"—"indicates that Section 340B is not intended to preempt the field." *Id.* (citation omitted).

13

AbbVie primarily relies on the one court to go against the grain. Doc. 7 at 12 (citing *Pharm. Rsch. & Mfrs. of Am. v. Morrisey*, 760 F. Supp. 3d 439, 456 (S.D.W.V. 2024)). But even that case did not find field preemption. *Id.* And that court's (erroneous) holding that a similar West Virginia state law regulates price as opposed to delivery does not overcome the plain text of HB 2048. *Morrisey,* in analyzing conflict preemption, premised its view on the basis that manufacturers "already deliver" their "drug products to contract pharmacies." 760 F. Supp. 3d at 456. This is irrelevant. Pharmacies are not covered entities, and they do not receive the 340B Program discount. With or without HB 2048, pharmacies will purchase non-340B drugs from manufacturers. Oklahoma law merely requires manufacturers to ship drugs purchased by covered entities to contract pharmacies. It does not deal with pricing.

AbbVie's attack on the replenishment accounting model does not change this conclusion. Doc. 7 at 12–13. HB 2048 speaks to delivery and delivery alone, no matter whether the delivery happens before or after a particular drug is dispensed to a patient. *See Fitch II*, 2024 WL 3503965, at *13–14. Consider a pharmacy and covered entity that decline to use the replenishment model. There, the entity purchases the drugs from the manufacturer and has them shipped to the pharmacy. Upon receipt, the pharmacy then dispenses the drug to the entity's patients. There can be no question, in that scenario, that HB 2048's requirement that the manufacturer send drugs to the pharmacy is regulating delivery. The only difference with the replenishment model is that the drug is replenished after the pharmacy has dispensed the drug to the entity's patients. In both cases, "[t]he amount of the discount is not at issue and is not affected by the state scheme." *Skrmetti*, 2025 WL 1805271, at *18 (rejecting AbbVie's replenishment argument because a similar state law merely "impos[ed] restrictions on where

14

[AbbVie] is willing to deliver drugs"). Accordingly, HB 2048 is not field preempted.

**C. HB 2048 does not conflict with federal law.**

Conflict preemption exists only where it is "impossible" to comply with state and federal law or where state law is "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Oneok*, 575 U.S. at 377 (citation omitted). HB 2048 produces no such conflict.

AbbVie first raises the same arguments it raised with field preemption, namely, that HB 2048 "frustrates Congress's judgment by expanding the 340B Program's burden on manufacturers." Doc. 7 at 13. This argument mistakenly assumes that congressional "silen[ce] about delivery," *Sanofi*, 58 F.4th at 703, preempts state regulation. But the Tenth Circuit has emphasized that "Congressional silence will not be presumed to mandate preemption." *Paul v. Monts*, 906 F.2d 1468, 1475 n.8 (10th Cir. 1990). "It will not be presumed that a federal statute was intended to supersede . . . the power of the state [without] clear manifestation of intent to do so." *Los Alamos Sch. Bd. v. Wugalter*, 557 F.2d 709, 714 (10th Cir. 1977). As the Program is "silent about delivery" and does not "mention contract pharmacies," 340B leaves room for states to regulate. *Sanofi*, 58 F.4th at 703. This is reinforced by the Eighth Circuit's conclusion that "Congress was aware of the role of pharmacies and state pharmacy law in implementing 340B." *McClain*, 95 F.4th at 1144. HB 2048 does not conflict with the Program.

Nor does HB 2048 interfere with the 340B Program's enforcement scheme. HB 2048's enforcement mechanisms do not conflict with the Program because the two statutes apply to different fields. Like Novartis's challenge, AbbVie relies on *Astra USA, Inc. v. Santa Clara County*, 563 U.S. 110 (2011), without acknowledging that *Astra* examined only whether a

covered entity could sue manufacturers for overcharging, as opposed to a preemption claim. Doc. 7 at 14. *Astra* does not stand for the proposition that all decisions possibly touching on the 340B Program must be made by HHS. *Cf. Sanofi*, 58 F.4th at 703. Instead, it recognized only that Congress created an "administrative framework . . . for covered entities complaining of '*overcharges* and other violations of the discounted *pricing requirements*.'" *Astra USA*, 563 U.S. at 122 (quoting 42 U.S.C. § 256b(d)(1)(A) (emphases added)). *Astra* does not control here.

In enforcing HB 2048, Oklahoma will have nothing to do with "pricing requirements." *Id.* Oklahoma adjudicators will only be asked to decide (1) whether manufacturers delivered the drugs to where covered entities wanted them delivered, or (2) whether manufacturers imposed certain discriminatory requirements on delivery. Only those two acts potentially create liability under HB 2048. Even *Astra* seems to leave room for assertions that drugmakers "violated a[] substantive obligation arising only from" something independent of the "340B ceiling price." *Id.* at 118–19. As any lawsuits under HB 2048 will focus on delivery, those suits will not be attempts to force manufacturers to comply with the federal Program. By the same token, the Program's enforcement process says nothing about delivery, so that process will not overlap with Oklahoma proceedings. *See, e.g.*, *Novartis*, 102 F.4th at 460.

Enforcement of HB 2048 will not require Oklahoma to adjudicate federal law. HB 2048's enforcement concerns "activity"—delivery—that "falls" beyond 340B's "purview." *McClain*, 95 F.4th at 1145. AbbVie's stated concern that it might defend itself in a potential HB 2048 proceeding by arguing that the entity ordering drugs was engaged in diversion or was ineligible for 340B discounts does not create conflict preemption. With regards to the defense that the healthcare provider was not actually a covered entity, that list is available online and

HB 2048 does not affect the list[4] in any way. Thus, there is no conflict with an Oklahoma adjudicator determining whether an entity is a covered entity. And AbbVie's concern about the hypothetical where it chooses to stop offering 340B discounts to a covered entity is illusory. Section 340B's anti-diversion provisions are enforced either by HRSA directly or after the fact through the ADR process. 42 U.S.C. §§ 256b(d)(2)(B)(v) & (3). As such, any HB 2048 adjudication will not implicate diversion. Regardless, that a manufacturer might raise federal law in defense to a state claim does not mean the state law conflicts with federal law.

Similarly, Oklahoma law does not restrict "manufacturers' access to the federal 340B dispute-resolution scheme." Doc. 7 at 15. AbbVie argues that because manufacturers must conduct an audit before accessing the ADR process, HB 2048's prohibition on manufacturers requiring claims data as a condition for delivering 340B drugs precludes it from entering ADR. When manufacturers wish to conduct an audit of a covered entity, they must demonstrate "reasonable cause," defined broadly to mean that a reasonable person could believe that a covered entity may have violated a statute. 61 Fed. Reg., 65,406, 65,409 (Dec. 12, 1996). This standard is "not overly burdensome[,]" *Skrmetti*, 2025 WL 1805271, at *15, and can be met merely by "[s]ignificant changes in quantities of specific drugs ordered by a covered entity" or "complaints from patients/other manufacturers about activities of a covered entity." 61 Fed. Reg., 65,406, 65,406. Here, AbbVie has failed to provide a single example of HRSA refusing a manufacturer's request to conduct an audit. Therefore, Abbvie "[has] not actually shown that [it] need[s] claims data and other documentation … in order either to request an audit or

---

[4]    HRSA, *Office of Pharmacy Affairs 340B OPAIS: Search Covered Entities*, https://340bopais.hrsa.gov/SearchCe.

to attempt to resolve a dispute in good faith before proceeding to ADR." *Skrmetti*, 2025 WL 1805271, at *16. HB 2048 does not stop AbbVie from participating in the federal ADR process. This is an attempt to manufacture a conflict where there is none.

Finally, AbbVie attempts to distinguish *McClain* by arguing that the Eighth Circuit's view that covered entities maintain title of the 340B drugs within the replenishment model is not true in Oklahoma. Doc. 7 at 16. But, the Eighth Circuit's conclusion did not rest on the belief that covered entities maintain title to drugs held at contract pharmacies. The logic of *McClain*'s analysis holds up regardless of whether covered entities maintain title. *See* 95 F.4th at 1143–46. Thus, other courts have followed *McClain* without predicating their holding on title. *See, e.g.*, *Pharm. Rsch. & Mfrs. of Am. v. Fitch*, No. 1:24-cv-160, 2024 WL 3277365, at *8–12 (S.D. Miss. July 1, 2024) (*Fitch I*); *Pharm. Rsch. & Mfrs. of Am. v. Murrill*, No. 6:23-CV-00997, 2024 WL 4361597, at *4–9 (W.D. La. Sept. 30, 2024). It is irrelevant to Oklahoma law whether covered entities maintain title of drugs when using the replenishment model. If Congress passed a law banning the replenishment model, Oklahoma's law would operate unchanged. *AbbVie Inc. v. Bailey*, No. 4:24-cv-996, 2025 WL 1918948, at *8 (W.D. Mo. Feb. 24, 2025). Even so, covered entities do maintain title of the drug. HRSA, FAQs: *What is a "ship to bill to" arrangement?*, https://www.hrsa.gov/opa/faqs; 75 Fed. Reg. 10272, 10277 (March 5, 2010). But, again, this is immaterial to AbbVie's preemption claims.

## II.     HB 2048 IS NOT AN UNCONSTITUTIONAL TAKING.

The Fifth Amendment's Takings Clause directs that no "private property be taken for public use, without just compensation." U.S. CONST. amend. V. A taking may occur in the form of either a "per se physical taking" or a "regulatory taking." *Cedar Point Nursery v. Hassid*,

594 U.S. 139, 147–49 (2021). AbbVie argues only that HB 2048 constitutes a physical taking. Doc. 7 at 17–20. Manufacturers have made this argument in courts across the country, and every court to rule on it has rejected it. *See, e.g.*, *Fitch II*, 2024 WL 3503965, at *18–20, *Skrmetti*, 2025 WL 1805271, at *19–20; *Murrill*, 2024 WL 4361597, at *13–15; *Astrazenca Pharms. LP v. Bailey*, No. 2:24-CV-04143, 2025 WL 644285, at *4–6 (W.D. Mo. Feb. 27, 2025). This Court should do the same.

A per se taking occurs "[w]hen the government physically acquires private property for a public use." *Cedar Point*, 594 U.S. at 147. Crucially, "[e]quitable relief is not available to enjoin an alleged taking of private property for a public use, duly authorized by law, when a suit for compensation can be brought against the sovereign subsequent to the taking." *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1016 (1984). Here, AbbVie argues that Oklahoma is forcing AbbVie to sell its drugs at the 340B price under conditions that it would not voluntarily accept. Doc. 7 at 17. But restricting the terms of a commercial sale in not the same as forcing the sale in the first place, and AbbVie cannot credibly describe Oklahoma's law as "tak[ing] the property of *A* for the sole purpose of transferring it to . . . *B*." Doc. 7 at 17 (quoting *Kelo v. City of New London*, 545 U.S. 469, 477 (2005)). Under HB 2048, Oklahoma will never take any property or mandate any sales at all. The law merely prohibits certain kinds of restrictions on sales that manufacturers were already making with covered entities. Trying to escape this conclusion, AbbVie implies that HB 2048 requires it to sell discounted drugs to pharmacies. Doc. 7 at 18. The law does no such thing. The Act defines "340B drug" in a way that prohibits pharmacies from purchasing drugs at the 340B discount. OKLA. STAT. tit. 36, §§ 5401(1), 5403(A). Specifically, "340B drug" is defined to only include drugs "purchased by a covered

entity." *Id.* § 5401(1). The only entities that can access the 340B discount are those permitted by federal law to purchase drugs at those prices. Under state law, therefore, "[p]harmacies do not purchase 340B drugs, and they do not receive the 340B price discounts." *McClain*, 95 F.4th at 1144; *Murrill*, 2024 WL 4361597, at *14; *Fitch II*, 2024 WL 3503965, at *19.

Furthermore, the 340B Program is voluntary, so AbbVie's participation "can hardly be called a taking." *Monsanto*, 467 U.S. at 1007. AbbVie chooses to offer discounted drugs to 340B hospitals "in exchange" for the "valuable" "benefit" of selling drugs to the federal government. *Horne v. Dep't of Agric.*, 576 U.S. 350, 366 (2015) (citation omitted). Oklahoma "does not require AbbVie to sell its drugs in [Oklahoma] at all." *Skrmetti*, 2025 WL 1805271, at *19; *Murrill*, 2024 WL 4361597, at *15. AbbVie retorts that it agreed to certain conditions with the federal government, not with Oklahoma. Doc. 7 at 19. But state laws addressing requirements for Medicare Part B and Medicaid participants do not change the choice to participate in the programs in the first place. It is *that* choice that "forecloses the possibility that the [state] statute could result in an imposed taking of private property." *Minn. Ass'n of Health Care Facilities v. Minn Dep't of Pub. Welfare*, 742 F.2d 442, 446 (8th Cir. 1984). Moreover, as the 340B Program "has had a well-known 'gap' about how delivery must occur since Congress enacted it[,]" it was "foreseeable to [AbbVie]" that "states might require Section 340B drugs to be distributed for dispensation at private pharmacies." *Fitch II*, 2024 WL 3503965, at *19; *Bailey*, 2025 WL 644285, at *6. Even the case AbbVie cites held only that a voluntary exchange does not exist when the "purported 'benefit' is illusory." *Valancourt Books v. Garland*, 82 F.4th 1222, 1232 (D.C. Cir. 2023). Here, AbbVie receives a "valuable benefit" by gaining access to the Medicare Part B and Medicaid markets. *Horne*, 567 U.S. at 366.

AbbVie's argument that HB 2048 does not serve a public purpose strains credulity. Doc. 7 at 18–19. In arguing this, AbbVie faces a high hurdle: "[w]ithout exception, [the Supreme Court] ha[s] defined that concept broadly, reflecting [its] longstanding policy of deference to legislative judgments." *Kelo*, 545 U.S. at 480. That private parties benefit from HB 2048 makes no difference. *Id.* at 485. What matters is that HB 2048 is "rationally related to a conceivable public purpose." *Haw. Hous. Auth. v. Midkiff*, 467 U.S. 229, 241 (1984). Here, it is. The "dispensation of 340B drugs at contract pharmacies advances public health." *Fitch II*, 2024 WL 3503965, at *20. As the State's declarants emphasize, manufacturers' restrictions on contract pharmacies threaten rural healthcare. Without HB 2048, covered entities face a future in which they must consider cutting important programs, such as a planned cancer facility. Ex. 2, ¶ 7; Ex. 4, ¶¶ 7–8.[5] In sum, even if HB 2048 required a taking, it is for a public use. Thus, there can be no injunction. *See Monsanto*, 467 U.S. at 1016. As one court noted, AbbVie has "not moved for a preliminary injunction on a theory that [state law] effects a taking for *public use* for which just compensation is owed." *Fitch II*, 2024 WL 3503965, at *20 (emphasis added). Thus, the fact that HB 2048 serves a public purpose is "sufficient reason to deny [AbbVie's] Motion as to their takings claim." *Id.*

## A.  HB 2048 is not vague.

AbbVie claims that the provision of HB 2048 that states that "[a] manufacturer shall not interfere with a pharmacy contracted with a 340B entity" is unconstitutionally vague. Doc.

---

[5] In arguing to the contrary, AbbVie relies on reports analyzing the 340B Program nationwide. Doc. 7 at 19. But those reports undercut AbbVie's arguments. For example, one shows that the majority of hospital and federal grantees that joined the Program in the last twenty years are located in counties with high poverty rates *and* low median income. Doc. 7-24 at 37. In any event, those reports focus on irrelevant policy disagreements with the program. Ex. 6 at 4.

7 at 20 (quoting OKLA. STAT. tit. 36, § 5403(B)). AbbVie takes particular issue with the word "interfere." *Id.* at 21. AbbVie's claims do not remotely approach the high standard that the Supreme Court requires plaintiffs to meet to deem a law unconstitutionally vague. Thus, yet again, every court to rule on this claim has rejected it. *See, e.g.*, *Murrill*, 2024 WL 4361597, at 10–12; *Skrmetti*, 2025 WL 1805271, at *20–22. This Court should do the same.

A law is unconstitutional only if it "forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning." *Cramp v. Bd. of Pub. Instruction*, 368 U.S. 278, 287 (1961). This standard requires much more than establishing that there is some "difficulty in determining whether certain marginal offenses are within the meaning of the language under attack." *See e.g., Jordan v. De George*, 341 U.S. 223, 231 (1951); *see also Hejira Corp. v. MacFarlane*, 660 F.2d 1356, 1367 (10th Cir. 1981) ("the fact that different minds may reach different results . . . does not render the statute void for vagueness"). "Language inevitably contains ambiguity[,]" but ambiguity alone does not make a statute unconstitutionally vague. *United States v. Solomon*, 95 F.3d 33, 35 (10th Cir. 1996). The burden for establishing vagueness is even higher when considering a civil law, such as this one, "because the consequences of imprecision are qualitatively less severe." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498–99 (1982). Similarly, the burden is higher for economic regulations because businesses can be expected to consult laws prior to acting. *Id.* And laws that do not implicate constitutionally protected conduct are not unconstitutionally vague unless "the enactment is impermissibly vague in all of its applications." *Id.* at 494–95.

"[R]ead in the context of the statute as a whole[,]" HB 2048 "provide[s] adequate notice of what conduct is prohibited and do[es] not invite arbitrary enforcement." *Skrmetti*, 2025 WL

1805271, at *21. Indeed, AbbVie's preemption and takings claims are premised on an understanding of what HB 2048 accomplishes. "The Act is targeted at precisely the conduct in which AbbVie . . . want[s] to engage in." *Id.* HB 2048 prohibits manufacturers from "impos[ing] restrictions on covered entities' access to 340B discounted drugs that are not expressly authorized by federal law." *Id.* That is not particularly complicated.

It matters little that "interfere" is not defined in the statute. The term first appears in subsection A, which provides that a "manufacturer shall not deny, restrict, prohibit, or otherwise interfere with, either directly or indirectly, the acquisition of a 340B drug by, or delivery of a 340B drug to a 340B entity, unless such receipt is prohibited by [HHS]." OKLA. STAT. tit. 36, § 5403(A). Under the *noscitur a sociis* canon of statutory construction, the word "interfere" must be interpreted in light of the other actions prohibited. *Murrill*, 2024 WL 4361597, at *10 (interpreting a similar provision). Therefore, the term "interfere" within HB 2048 "proscrib[es] actions that prevent or hinder the acquisition or delivery of Section 340B drugs to contract pharmacies." *Id.* Although subsection B does not contain the same list of words alongside "interfere," it is axiomatic that "identical words and phrases within the same statute should normally be given the same meaning." *Powerex Corp. v. Reliant Energy Servs., Inc.*, 551 U.S. 224, 232 (2007). That is to say, "interfere" in A means the same thing as in B.

AbbVie's reliance on *Carolina Youth Action Project v. Wilson*, 60 F.4th 770, 786 (4th Cir. 2023), does not affect this conclusion. Doc. 7 at 21. There, the statute made it a crime to "willfully or unnecessarily" "interfere with or to disturb in any way or in any place the students or teachers of any school or college in this State," "to loiter about such school or college premises," or "to act in an obnoxious manner thereon." *Id.* at 786. The differences between

that law and HB 2048 are numerous. There are obvious ambiguity problems with criminalizing acting in "an obnoxious manner" at school. Put differently, the Circuit's vagueness analysis focused on other words besides "interfere"—namely, "unnecessary disturbances, loitering, or obnoxiousness in schools." *Id.* And because that state statute was a criminal prohibition, it was held to "a stricter standard" than the civil law at issue here. *Id.* at 781.[6]

AbbVie has not credibly argued that it will likely face criminal penalties for violating HB 2048. The Act authorizes exclusively civil penalties. OKLA. STAT. tit. 36, § 5404. AbbVie's citation to a different statute within the Oklahoma Insurance Code that states that "violation of any provision of this Code shall constitute a misdemeanor[,] *id.* § 117, does not transform this civil statute into a criminal one. Among other things, AbbVie has not cited "any instances in which criminal charges were brought against a corporation for violation of the [Oklahoma Insurance Code]." *Skrmetti*, 2025 WL 1805271, at *10. Accordingly, HB 2048 is not vague.[7]

## III.    THE OTHER EQUITABLE FACTORS COUNSEL AGAINST INJUNCTIVE RELIEF.

AbbVie's failure to establish a likelihood of success is enough to deny an injunction. In addition, an injunction would irreparably harm the State, its citizens, and the public interest. Blocking a "duly enacted [state law] clearly inflicts irreparable harm on the State." *Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018). The harm is especially severe here because the Act serves compelling public interests in protecting health and safety.

---

[6] AbbVie also complains that HB 2048 does not contain a scienter requirement. Doc. 7 at 21. The Attorney General, however, may "establish rules and regulations interpreting" the law. OKLA. STAT. tit. 36 § 5404. The Attorney General has not had the opportunity to issue such regulations, which might include an intent requirement. And a future application of the law to a manufacturer for a violation that lacked intent would be grounds for an las-applied challenge.
[7] As AbbVie seeks an injunction on this ground against only OKLA. STAT. tit. 36, § 5403(B), any injunction based on this claim should be limited to that provision.

Enjoining the Act would irreparably harm the State's vulnerable populations and hospitals. *See, e.g.*, Alaa Ziad Haidar, *Recent 340b Contract Pharmacy Troubles and the Necessary Solution*, 33 HEALTH LAW. 34, 34 (2020) (describing the benefits of contract pharmacies). Allowing covered entities to contract with pharmacies to receive 340B drugs enables Oklahoma hospitals to continue to provide valuable services to rural communities. Ex. 1, Decl. of Alexis Ngo, ¶ 5, Ex. 2, ¶¶ 5–6; Ex. 3, Decl. of Steve Hartgraves, ¶¶ 6–7; Ex. 4, ¶ 7. Without HB 2048, rural Oklahomans would likely lose access to certain services that can only be offered by rural hospitals using the money from the 340B program. For example, Stillwater Medical Center Authority has lost over $3 million annually since manufacturers began restricting the use of contract pharmacies. Ex. 2, ¶ 7. This has forced it to consider closing primary clinics located in rural areas. *Id.*; Ex. 4, ¶¶ 7–8. Moreover, the restrictions on contract pharmacies have threatened the tens of millions of dollars' worth of charity care that Oklahoma covered entities provide. Ex. 4, ¶¶ 7–8. Ex. 5, Decl. of Richard Lofgren, ¶¶ 4–5, 7.

AbbVie argues that it will be irreparably harmed by losing its constitutional rights. Doc. 7 at 23. But that argument falls with its merits case. AbbVie also complains that HB 2048 will cost it millions *Id.* at 35. But the Act does not require AbbVie to provide discounted prices. Any harm from the discounts would stem from the 340B Program itself—which is where AbbVie's real complaint appears to lie. And whatever compliance costs AbbVie alleges will result from HB 2048 are outweighed by the benefits they receive from the 340B Program. In any case, the harm to the State and public outweighs AbbVie's hypothetical financial costs.

## CONCLUSION

Defendants respectfully request that this Court deny AbbVie's Motion.

Respectfully submitted,

*s/ Will Flanagan*

GARRY M. GASKINS, II, OBA 20212
  *Solicitor General*
ZACH WEST, OBA 30768
  *Director of Special Litigation*
WILL FLANAGAN, OBA 35110
  *Assistant Solicitor General*
ADDISON GAUT, OBA 36457
  *Assistant Attorney General*

OFFICE OF ATTORNEY GENERAL
  STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
Phone:  (405) 521-3921
Garry.Gaskins@oag.ok.gov
Zach.West@oag.ok.gov
William.Flanagan@oag.ok.gov
Addison.Gaut@oag.ok.gov

*Counsel for Defendant*