# Exhibit 6

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| AbbVie Inc., *et al.*, *Plaintiffs,* v. Gentner Drummond, in his official capacity as Attorney General of Oklahoma, *Defendant.* | No.    5:25-cv-726-PRW |

Preliminary Expert Report of Dr. Madeline Carpinelli Wallack

## I.  Introduction

1. I am a recognized leader in government drug pricing programs, including the 340B program, and the co-founder of Rx|X Advisory Services. With over 26 years of experience, I have dedicated my career to working in pharmaceutical public policy. I have worked with the Federal Government, academia, and directly with covered entities since my career began in 1999. My extensive experience in research, policy evaluation, compliance auditing, and consulting underscores my deep understanding of the 340B program and my ability to provide expert insights in matters related to the program.

2. I am the co-founder and CEO of Rx|X Advisory Services, a compliance and consulting firm that works with covered entities on compliance with 340B program requirements. I work directly with covered entities and lead comprehensive program audit evaluations, assist covered entities in audits by the Health Resources and Services Administration (HRSA) and manufacturers, perform contract pharmacy audits, aid with program design, risk assessments, financial reviews, and dispute resolution. In 2024, I launched a cloud-based audit tool, Avanti340B, which is designed to detect issues related to 340B procurement and the management of virtual inventories.

3. I hold a Master of Science and a Ph.D. in Social and Administrative Pharmacy from the University of Minnesota's College of Pharmacy, with both thesis projects focusing on the 340B program. More specifically, my doctoral research examined enrollment and participation trends among critical access hospitals (CAHs) in the 340B program, providing crucial insights into the factors influencing hospital engagement with the program.

4. My career began at the United States Department of Health & Human Services (HHS), Office of Inspector General (OIG), where I served as a Senior Policy Analyst and Manager

1

for over seven years. In this role, I managed national evaluations of government drug price reporting and compliance, including oversight of the 340B Drug Pricing Program. I initiated and chaired the OIG's 340B Drug Pricing Work Planning group and published key studies that led to significant improvements in HRSA's 340B database and program integrity measures, including entity audits. The studies I worked on are included in my CV.

5. Following my tenure at HHS, I transitioned to the private sector as a Senior Director at Wellpartner, Inc., a 340B Third Party Administrator, where I advised covered entities on compliant use of contract pharmacies. At this time, HRSA allowed use of one contract pharmacy by covered entities but permitted covered entities to apply to use more than one contract pharmacy through a program called the Alternative Methods Demonstration Project (AMDP). In 2007, during my time at Wellpartner, HRSA proposed use of multiple contract pharmacies. As such, much of my position for a year and a half was focused on the anticipated transition from a single contract pharmacy to multiple contract pharmacies as the result of the guidance.

6. In 2008, I began my graduate education at the University of Minnesota and worked as a Research Specialist at the University of Minnesota's PRIME Institute under drug pricing expert, Dr. Stephen Schondelmeyer. My role included the analysis of public policy and economic impacts of pharmaceutical regulations. In 2008, I testified before the United States Senate Joint Economic Committee on "Extraordinary Drug Price Increases." Additionally, I assisted Dr. Schondelmeyer on several pharmaceutical industry lawsuits, namely State litigation on Medicaid payment for drugs. Relying on this experience in litigation support, in 2009, I was retained for expert support on the 340B overcharge case that ultimately was dismissed by the Supreme Court but was still an important 340B case, *Santa Clara v. AstraZeneca*.

7. Between 2010 and 2013, I worked as a Regional Advisor with the American Pharmacist Association, Federal Contracts & Grants, the organization contracted with the HRSA at the time to provide technical assistance on compliance and related issues for covered entities and manufacturers through its Pharmacy Services and Support Center (PSSC). In this position, I analyzed proposed or final rules or regulations impacting the 340B program and prepared summaries and impact analysis for HRSA's Office of Pharmacy Affairs (OPA). I also created monthly policy briefs on issues impacting the 340B program, such as Medicaid reimbursement policies, Accountable Care Organizations, and the implementation of provisions in the Affordable Care Act (ACA) impacting the 340B program. In 2010, HRSA adopted guidance allowing covered entities to use multiple

contract pharmacies and I worked closely with OPA and PSSC on implementation of this guidance.

8. In 2010, The Affordable Care Act gave HRSA the authority to conduct audits of covered entities. I worked closely with a team at the PSSC to develop the audit methodology and to provide feedback on the two years of 340B audits conducted by HRSA. In this role, I supported and served as technical support contact for HRSA staff and auditors carrying out HRSA's audit authority. In addition, I helped support the national 340B Peer-to-Peer ("P2P") program, a collaboration of leading 340B entities engaged in sharing best practices and providing education. The P2P had monthly presentations and biannual in-person meetings that I helped to facilitate.

9. In 2016, 2018, and 2020, I contributed foundational content to the Apexus Advanced 340B Operations Certificate (ACE), which provides specialized training in 340B compliance and implementation. I have maintained my ACE certification since its inception and continue to collaborate with Apexus.

10. My industry expertise is further demonstrated by my extensive speaking engagements—I have presented on 340B-related topics at over 35 conferences. In 2025 and 2018, I co-authored Chapter 11 of *The 340B Handbook*, focusing on 340B considerations for rural hospitals.

11. The Oklahoma Office of the Attorney General is reimbursing me at $600 per hour to prepare this preliminary expert report. Given the short time frame provided, and the preliminary nature of the report, I reserve the right to alter this document moving forward. My curriculum vitae is attached.

## II. Assignment, Records Reviewed and Summary of Conclusions

12. I have been asked by Defendants' counsel to review and respond to AbbVie's July 24, 2025, Motion for a Preliminary Injunction, the Declaration of Edward Scheidler, and the expert reports of Amitabh Chandra, PhD and Alice Chen, PhD, both from July 23, 2025.

13. In forming my opinions, I have evaluated the 340B program using the standards used to govern its operation—namely, the statute, implementing regulations, and HRSA guidance. By contrast, the two expert reports appear to critique program operations against expectations and constructs that are not required by law and have no binding effect on covered entities. In essence, they are applying a "measuring stick" of their own creation,

3

one that reflects policy preferences rather than enforceable compliance standards. This approach does not provide meaningful analysis of the facts at issue in this case, because it evaluates outcomes against an imagined framework rather than the legal and regulatory framework that defines the 340B program. Put succinctly, the conclusions presented in the two expert reports divert attention toward generalized public policy arguments about the 340B program that have no bearing on the specific matters before the Court. For my general thoughts on these policy questions and why they are irrelevant to this matter, please refer to my 2014 article, "Study Draws Misleading Conclusions Regarding 340B Program," in Health Affairs.[1] These same questions around location of 340B providers or the measurement of community benefit have been around for several years, yet there have been no changes in the rules or requirements to 340B entities. As such, I view these two reports as contributing to the policy discussion, but not to this suit.

   a. Dr. Chandra's report focuses on how 340B savings are used specifically relating to charity care, reduction of bad debt or to improve patient care outcomes, none of which are required by the 340B Statute. The conclusions, therefore, offer commentary on an invented standard rather than the actual requirements governing covered entities.

   b. Dr. Chen's report focuses on 340B program growth. It is my opinion that the opposing experts' emphasis on program growth is misplaced. Growth is not a statutory or regulatory standard for 340B. The law does not say that the 340B program cannot grow or that growth means noncompliance. This is a policy argument that, in my opinion, has no bearing on this case.

14. The Declaration of Edward Scheidler, Head of the 340B Center of Excellence at AbbVie, makes several statements, to which I offer rebuttals:

   a. **"AbbVie has stopped providing 340B-discounted drugs to an unlimited number of contract pharmacies for hospital covered entities… AbbVie's policy in no way affects patient access to drugs." (p.3 ¶¶4–5)**

   In my opinion, this conclusion is unsupported, and AbbVie's policy is likely in violation of the following sections in Oklahoma's HB 2048:

---

[1] Wallack, Madeline. (2014, October 23) *Health Affairs*. "Study Draws Misleading Conclusions Regarding 340B Program." https://www.healthaffairs.org/content/forefront/study-draws-misleading-conclusions-regarding-340b-program#comments.

4

> *A.    A manufacturer shall not deny, restrict, prohibit, or otherwise interfere with, either directly or indirectly, the acquisition of a 340B drug by, or delivery of a 340B drug to a 340B entity, unless such receipt is prohibited by the United States Department of Health and Human Services.*
>
> *B.    A manufacturer shall not interfere with a pharmacy contracted with a 340B entity.*
>
> *C.    A 340B entity shall contract with any willing pharmacy upon mutually agreeable terms within a fifteen-mile radius of the 340B entity's location.*
>
> *D.    Nothing in this section shall be construed to limit the number of pharmacies that a 340B entity shall be allowed to contract with.*

The 340B contract pharmacy pathway is based on a specific framework for specific reasons. The 340B statute is silent about delivery, but there needs to be logical pathways to distribute and dispense to patients. HRSA permitted one of those ways through partnerships with pharmacies. For most contract pharmacy arrangements, this works through replenishment.

Replenishment is an efficient way to manage inventory on the shelves at contract pharmacies. Covered entities decide the criteria for 340B qualification through the contract pharmacy using a third-party administrator (TPA), a vendor who specializes in the electronic tracking and sharing of data between the pharmacy and the entity. Covered entities share details on the health care providers and the department locations from the electronic medical record (EMR) to include and a list of Medicaid plans for exclusion. When drugs are dispensed to patients who meet these criteria, the TPA designates fills as 340B. The covered entity has a separate account used to place an order that is shipped to the pharmacy. The qualification filters and qualified transactions are monitored and audited by the covered entity.

AbbVie's policy disrupts this pathway by refusing to allow replenishment through contract pharmacies. Without replenishment, the 340B contract pharmacy pathway cannot function as designed. Covered entities cannot simply purchase drugs through contract pharmacies at non-340B prices, meaning the statutory framework authorized by HRSA is effectively broken.

Thus, AbbVie's policy does affect patient access to 340B drugs. AbbVie's restriction directly undermines the replenishment model that enables covered entities to dispense 340B drugs to patients through contract pharmacies. By blocking replenishment, AbbVie interrupts a legally recognized and operationally necessary pathway, creating barriers for patients who rely on these pharmacies for access to their prescriptions. In this way, AbbVie's policy does affect patient access to drugs—

5

by dismantling the very mechanism Congress and HRSA intended to ensure those drugs reach patients in need.

**b. "There is no such thing as a '340B drug'; the label is a misnomer." (p.4 ¶7.a)**

This statement is semantically framed but functionally misleading. While the molecule is identical, pricing, distribution terms, data handling, and compliance obligations attach to covered entity purchases under 340B. Thus, in routine commercial usage, stakeholders refer to "340B-priced units" or "340B accumulations" precisely because these units are subject to specific statutory pricing and compliance conditions. They are different.

The 340B statute imposes a ceiling price and duplicate-discount protections; wholesalers and TPAs track accumulations and eligibility status to segregate these units operationally. Inventory, eligibility, and billing rules (e.g., Medicaid Exclusion File logic) require entities and TPAs to treat 340B-priced product as a distinct compliance class, even if chemically identical.

Oklahoma's HB 2048 defines "340B drug" as a drug that has been subject to any offer for reduced prices by a manufacturer pursuant to Section 256b of Title 42 of the United States Code and is purchased by a covered entity as defined in Section 256b(a)(4) of Title 42 of the United States Code. Price is a characteristic of the program, but you must have a process that transforms the drug from a retail priced AbbVie drug to one that is subject to the 340B program requirements, or a 340B drug. AbbVie's policy has cut off the process. No one in the industry is confused as to what is meant by a "340B drug."

340B contract pharmacy arrangements are defined by the Health Resources and Services Administration (HRSA), which oversees the 340B program, and are subject to specific program integrity requirements.

- "340B Contract Pharmacy" is a formal term recognized by HRSA and established through written contracts between a covered entity and a pharmacy. These agreements outline the exclusive purpose of dispensing 340B-purchased drugs to eligible patients on behalf of the covered entity.
- The contract pharmacy operates only under the authority and eligibility standards of the 340B program, and the contract pharmacy's registration in the Office of Pharmacy Affairs Information System (OPAIS) database confirms this designation.
- There is no HRSA-sanctioned pathway within this arrangement to handle "non-340B" transactions on behalf of the covered entity.

6

In sum, calling "340B drug" a misnomer obscures the real-world operational and legal distinctions that attach to covered-entity purchases and dispensing events.

c. **"The availability of 340B pricing has no bearing on patient access or a drug's availability." (page 5 at paragraph 7.b)**

AbbVie's contract pharmacy policy does materially impact covered entities' and contract pharmacies' access to 340B drugs.

Covered entities are being denied the ability to fully operationalize their 340B Eligibility through AbbVie's policy. In the 1996 Notice on Contract Pharmacies, HRSA states "The statute is silent as to permissible drug distribution systems. There is no requirement for a covered entity to purchase drugs directly from the manufacturer or to dispense drugs itself. It is clear that Congress envisioned that *various types of drug delivery systems* would be used to meet the needs of the very diversified group of 340B covered entities." 61 Fed. Reg. 43549, (Aug. 23, 1996).

By imposing distribution limitations that bypass HRSA's established rules for 340B contract pharmacy registration and use, AbbVie is unilaterally restricting covered entities' access to 340B drugs—an action that runs counter to the statutory purpose of covered entity access to discounted drugs.

Covered entities are required to register all shipping locations in HRSA's 340B Office of Pharmacy Affairs Information System (OPAIS) to communicate to manufacturers where 340B drugs are sent. OPAIS is the official roster of approved locations for 340B use. AbbVie's refusal to ship 340B drugs to contract pharmacy locations that are registered to the covered entity creates a barrier to access. Practically speaking, if 340B drugs ordered by the covered entity aren't shipped to the pharmacy, the covered entity does not receive the benefit of the 340B program, as intended, or, in the case where the 340B discounts are passed on to patients at the point of sale, this is no longer possible.

In addition to the restrictions themselves, AbbVie has forced covered entities to submit claims data through the portal 340B ESP™. This claims data submission process is burdensome and requires additional resources from covered entities.

The 340B ESP™ reporting requirements have added detailed reporting requirements not mentioned in neither HRSA's 1996 nor its 2010 guidelines. Reporting transactional data in the detail required by 340B ESP™ has proven much more restrictive than anything considered by HRSA in either Federal Register notice.

    d. **In paragraph 9 on page 6, Mr. Scheidler makes several incorrect statements about the process by which 340B hospitals qualify drugs as 340B in contract pharmacies. Specifically, Mr. Scheidler says "This [340B eligibility] determination is typically made via the contract pharmacy's own criteria, without any involvement from the covered entities."**

Covered entities, not contract pharmacies, are the responsible parties for 340B drug purchases and compliance. ("The covered entity has, and continues to bear, full responsibility and accountability for compliance with all [340B] requirements. . ." HRSA Notice Regarding 340B Drug Pricing Program—Contract Pharmacy Services, 75 Fed. Reg. 10, 10272, 10,273 (March 5, 2010)).

Under HRSA rules, covered entities are accountable for ensuring that all 340B purchases meet program requirements, including preventing diversion and duplicate discounts. HRSA audits covered entities—not contract pharmacies—reinforcing that liability for compliance remains with the covered entity. This includes financial responsibility for the purchases, adherence to program rules, and maintaining auditable records.

In a HRSA audit, covered entities are required to produce all the transactions dispensed via the 340B contract pharmacy relationship for a sampled timeframe. All of these transactions are purchased through the covered entity's 340B account.

The 340B program does not recognize a hybrid model under contract pharmacy arrangements—transactions are either 340B (within the agreement) or they fall outside the 340B framework altogether (i.e., handled separately by the pharmacy for its own business, not on behalf of the covered entity).

340B contract pharmacy arrangements have a defined operational structure. In a contract pharmacy arrangement, the covered entity—not the pharmacy—purchases and owns the 340B drug inventory, determines patient eligibility, and selects drugs to be replenished under 340B pricing. The pharmacy fills solely a dispensing role.

Covered entities must develop specialized inventory management systems to prevent diversion and Medicaid duplicate discounts, conduct internal and

external audits for compliance with HRSA's requirements, respond to HRSA audits and manufacturer inquiries, and, most recently, comply with data submission requirements to 340B ESP platform as a condition imposed by drug manufacturers for the covered entity to obtain 340B discounts.

If a prescription does not qualify under 340B, it simply falls outside the arrangement—it is not reclassified as a "non-340B transaction" by the covered entity.

Finally, debates about inventory methodology (e.g., virtual vs. physical, replenishment logic) are not determinative in this case unless tied to a concrete allegation of diversion or duplicate discount. Inventory methods are implementation choices overseen by internal controls and audits; they do not alter the statutory obligation to provide 340B pricing to covered entities

e. **"AbbVie will face the threat of millions of dollars in forces unnecessary discounts each year as a result of H.B. 2048". (p.13 ¶21)**

Mr. Scheidler asserts that AbbVie will face "unnecessary discounts" under H.B. 2048. That characterization is misleading. The 340B program is not new, nor are its requirements. It has been federal law since 1992, with contract pharmacy use recognized since 1996 and expanded in 2010. Drug manufacturers are required to calculate the pricing metrics that determine the 340B ceiling price, and compliance with this formula is statutory—not optional.

Manufacturers routinely engage in sophisticated pricing strategy and liability modeling years in advance. It is therefore not credible to suggest that compliance with long-standing federal pricing rules constitutes an unforeseen "injury." Claims of sudden, unmanageable impact are inconsistent with standard forecasting practices across the industry.

AbbVie's record demonstrates a deliberate pattern of resistance to 340B. In 2021, a U.S. House committee found that AbbVie exploited the orphan drug program to shield Humira from 340B pricing.[2] AbbVie obtained eight orphan designations, even though

---

[2] U.S. House Committee on Oversight and Reform. (2021, May). *Drug pricing investigation: AbbVie—Humira and Imbruvica* (Staff Report). Retrieved from the U.S. House of Representatives Committee on Oversight and Reform website: https://docs.house.gov/meetings/GO/GO00/20210518/112631/HHRG-117-GO00-20210518-SD007.pdf.

9

Humira's sales exceeded $21 billion annually at the time—making it the highest-grossing prescription drug in the United States. Because rural hospitals designated under the ACA cannot purchase orphan drugs at 340B pricing, this tactic effectively excluded significant portions of the safety-net sector.

AbbVie has also raised Humira's price repeatedly without corresponding clinical improvement. According to the House Oversight Committee, AbbVie increased Humira's price 27 times since its 2003 launch. The Institute for Clinical and Economic Review (ICER) estimated Humira's net U.S. price increased 29.6% between 2017 and 2020 alone, resulting in nearly $1.4 billion in unsupported spending.[3] Under federal law, excessive price hikes trigger inflationary penalties that reduce both Medicaid rebates and the 340B ceiling price. For Humira, this has led to "penny pricing," where the 340B ceiling price is capped at $0.01 per unit—a direct and foreseeable consequence of AbbVie's own pricing strategy.[4]

In addition, AbbVie has pursued an aggressive patent strategy to extend Humira's monopoly, filing more than 250 patent applications. This enabled AbbVie to block or delay biosimilar competition until 2023 through settlement agreements, preserving billions in revenue. The House Oversight Committee also documented AbbVie's use of "shadow pricing" with Amgen's Enbrel, where both manufacturers raised prices in lockstep, driving costs higher across the system.[5]

Taken together, AbbVie's tactics—restricting specialty pharmacy access, exploiting orphan designations, resetting NDCs to avoid statutory penalties, building patent thickets, and coordinating price increases—reflect a consistent strategy: maximize Humira's profitability while resisting obligations under 340B. The program reduces AbbVie's margins on its most lucrative drug, and AbbVie has a clear financial incentive to minimize its reach. Of course AbbVie wants to limit 340B—the company has been working toward that goal for years.

f.  In addition to the rebuttals, I offer the following on 340B program intent. The purpose of the 340B program as stated in the House Committee report, which states, "In giving these "covered entities" access to price reductions, the Committee intends to enable these entities to stretch scarce Federal resources as far as possible, reaching more

---

[3] Kansteiner, Fraiser. (2021, November 16). *AbbVie's 'unsupported' price hikes on Humira drove $1.4B in extra US drug spending, ICER says."*  Fierce Life Sciences.
[4]  340B Ceiling Price and Civil Monetary Penalties final rule (82 FR 1210, January 5, 2017)
[5] AbbVie Staff Report at v.

10

eligible patients and providing more comprehensive services."" H.R. Rep. No. 102-384, pt. 2, at 12.

While this is very well-known quote, the Committee report also emphasizes that the 340B legislation does not limit the number of drugs that a "covered entity" may procure for purposes of receiving price reductions under this agreement. It further concludes that the legislation does not authorize the Secretary to limit in any way the volume of purchases that can be made at the price reduction provided under the Secretary's agreements with manufacturers.

_____
Dr. Madeline Carpinelli Wallack

Dr. Madeline Carpinelli Wallack
RxIX Advisory Services, LLC
Co-Founder & CEO
1296 S. Fillmore St, Denver, CO 80210
612.801.0976
mwallack@rxxconsulting.com

## SUMMARY

340B and Medicaid Drug Rebate Program Subject Matter Expert with 26 years' experience in the industry specializing in the resolution of complex 340B matters with covered entities via audits and in litigation. Dr. Wallack works directly with 340B covered entities on compliance matters through her firms, RxIX Advisory Services, LLC, and Avanti340B, LLC, but also serves as a Subject Matter Expert in lawsuits, has authored several 340B research projects, presented at industry conferences, and created educational programs for Apexus and for clients.

## WORK EXPERIENCE

**RxIX Advisory Services, Inc.,** *Co-founder and CEO of an independent, women-owned, consulting firm founded in 2009 to support 340B entities compliance and oversight needs*

June 2009-Present
- Lead support efforts for 340B entities' compliance and oversight needs for 90+ clients across the U.S.
- Assists 340B entities with program setup, audits, data analytics, pharmacy audits, risk assessments, financial reviews, policy forecasting, compliance matter resolution, dispute settlements, HRSA support, and operations - a full suite of support.
- Consults directly with covered entities to navigate the program more efficiently and effectively.
- Serves as Subject Matter Expert (SME) and/or provides litigation support for several 340B and Medicaid Drug Rebate Program matters. More information about the specific cases is available upon request.
- Launched inventory reconciliation tool, *Avanti 340B*™, in 2024.

**American Pharmacist Association, Federal Contracts & Grants, Regional Advisor**
September 2010-June 2013

- Assisted HRSA with the creation of the entity audit process
    - Supported and served as contact for HRSA Office of Regional Operations staff and auditors during 340B audits.
    - Reviewed the 340B audits and Corrective Action Plans (CAPs) for consistency and process improvements.
- Analyzed agency proposed/finalized rules and regulations and communicated to HRSA on observations.
- Created monthly policy briefs or briefs as assigned on current issues impacting the 340B program, such as Medicaid reimbursement policies and the impact of State actions.
- Helped facilitate the Peer to Peer (P2P) program for

**University of Minnesota's Pharmaceutical Research in Management & Economics (PRIME) Institute, Minneapolis, MN Research Specialist**
June 2008-June 2013

- Testified before the Senate Joint Economic Committee on "Extraordinary Drug Price Increases," at the request of Sen Amy Klobuchar (D-MN), July 2008.
- Assisted with the preparation of testimony for State and Federal Legislatures.
- Designed research regarding public policy, economics, and management of the pharmaceutical market.
- Estimated financial impact of legislative changes in response to requests from Congress, State and Federal governments, and advocacy groups.

**Wellpartner, Inc., Portland, OR, Senior Director, Professional Services Group,**
January 2007-March 2008
- Initiated development of the company's 340B consulting practice focused on assisting covered entities with assessing, understanding and implementing 340B program opportunities, particularly around the movement from one contract pharmacy to multiple.
- Developed data collection and analytics to measure the benefits of participation in 340B; created strategic plans for implementation of contract pharmacy solutions; and evaluated effectiveness post-implementation.

**US Department of Health & Human Services, Office of Inspector General Office of Evaluation and Inspections, Chicago, IL Senior Policy Analyst & Manager**
August 1999-December 2006

- Led national management and policy evaluations of the 340B Drug Pricing Program, Medicaid Drug Rebate Program, Medicare Part B, and Part D.
- Initiated and Co-chaired the OIG's National Drug Policy Work Planning group's strategic plan for all 11 offices.
- Collaborated with agencies across HHS, including HRSA, CMS and the DOJ on drug pricing projects and investigations.
- Key OIG publications include:
  - Review of 340B Prices, OEI-05-02-00073, July 2006
  - Deficiencies in the Oversight of the 340B Drug Pricing Program, OEI-05-02-00072, October 2005
  - Status of the Rural Health Clinic Program, OEI-05-03-00170, August 2005
  - Deficiencies in the 340B Drug Pricing Program Database, OEI-05-02-00071, June 2004
  - Medicaid's Costs for Mental Health Drugs, OEI-05-02-00080, August 2003
  - Problems Pervade the Renal Beneficiary and Utilization System, OEI-07-01-00250, February 2002
  - Medicaid HIV/AIDS Cost Containment Strategies, OEI-05-99-00611, July 2001
  - ADAP Cost Containment Strategies, OEI-05-99-00610, September 2000

# EDUCATION

University of Minnesota, Minneapolis, MN
Ph.D., Social and Administrative Pharmacy, June 2013
Thesis: *"The 340B Drug Discount Program: Enrollment and Participation among Critical Access Hospitals"*

Master of Science, Social and Administrative Pharmacy, March 2012
Thesis: *"Impact of the Orphan Drug Exception on 18 Critical Access Hospitals"*

Saint Mary's College, Notre Dame, IN
B.A. in Political Science & English Literature, 1999 *magna cum laude*

# AWARDS AND CERTIFICATIONS

2024 Apexus Advanced 340B Operations Certificate (ACE) renewal

2021 Apexus Advanced 340B Operations Certificate (ACE) and 2020 sole selected vendor to assist in the creation of content for the annual update module

2007 Award of Excellence from the President's Council on Integrity & Efficiency for the Evaluation of HRSA Oversight of the 340B Drug Discount Program

2002 OIG Outstanding Inspection of the Year, Cost Containment of Medicaid HIV/AIDS Drug Expenditures

## PUBLICATIONS

"340B Considerations for Rural Hospitals. In: Wilson AL ed. The 340B Program Handbook: Integrating 340B into the Health System Pharmacy. American Society of Health-System Pharmacists," 2018 and 2024 editions

"Study Draws Misleading Conclusions Regarding 340B Program," Health Affairs, October 2014

"The 340B Drug Discount Program: Enrollment and Participation by Critical Access Hospitals" Doctoral dissertation, ProQuest Dissertations & Theses database, July 2013

"The Patient Safety and Clinical Pharmacy Collaborative: Improving Medication Use Systems for the Underserved." *Journal of Health Care for the Poor and Underserved.* Vol 23, No. 3, August 2012

"Excluding Orphan Drugs from the 340B Drug Discount Program: The Impact on 18 Critical Access Hospitals." *Innovations in Pharmacy.* Vol 3, No. 1, March 2012

"Demonstrating the Value of the 340B Program to Safety-Net Hospitals and the Vulnerable Patients They Serve," Prepared for the Safety Net Hospitals for Pharmaceutical Access, June 2011

# RESEARCH ACTIVITIES

"Non-governmental Organizations Treatment of Gift-in-Kind Donations," Data and Advisory Services to the Financial Accounting Standards Board, the Partnership for Quality Medical Donations and World Vision, March 2010

"Determining the Impact of FQHCs Inclusion in Medicare Part D's True Out of Pocket Expenses," Prepared for HRSA's Office of Pharmacy Affairs for the House Energy and Commerce Committee, July 2009

"Measuring the Extent of Sub-ceiling Discounts in the 340B Program," Used internally for hospitals belonging to the Safety Net Hospitals for Pharmaceutical Access, January 2009

"Pharmacy Ownership versus Chain Drug Stores," Analysis prepared for the North Dakota Pharmacists Association, November 2008

"Extraordinary Drug Price Increases," Report prepared for Senator Amy Klobachar, D-MN, July 2008

"Constituency Contact and Citizen Knowledge," Results from Student Independent Study & Research Grant, 1999

# PRESENTATIONS

- "340B Program Update." Premier Breakthrough Sessions, June 2023, Nashville, TN
- "340B Program Developments", panel with Ted Slafsky, Madeline Wallack and Chris Hatwig, Association for Value Based Cancer Care (AVBCC) 2020 Summit, December 2020
- "340B Vendor Perspectives" 340B Coalition Winter Meeting, San Diego, CA, February 2016
- "340B and Specialty Pharmacy," Therigy Specialty Pharmacy Conference, Orlando, FL, October 2013
- "State and Local Governments and 340B," 340B Coalition Annual Meeting, Washington DC, July 2012
- "340B 101" and "History of Average Manufacturer's Price", 340B Coalition Annual Winter Meeting, San Diego, CA, February 2012

- "340B Pricing Primer" and "Impact of the Orphan Drug Exception on Critical Access Hospitals," 340B Coalition Annual Meeting, Washington DC, July 2011
- "Update on the AMP Litigation" and "Enforcement Issues for the 340B Program," 5th Annual 340B Coalition Winter Conference, Safety Net Hospitals for Pharmaceutical Access, San Diego, CA, February 2009
- "Extraordinary Drug Price Increases," Statement before the Joint Economic Committee, Washington, DC, July 2008
- "The Deficit Reduction Act of 2005: The Road Ahead for Managed Care," MedImpact's Annual Meeting, San Diego, CA, March 2007
- "PHS Update Panel: OIG Review of 340B Drug Prices," DataNiche Associates Fall Medicaid Drug Rebate Meeting, Denver, Colorado, September 2006
- "Review of 340B Drug Prices," Keynote Address, Institute for International Research's annual Medicaid Drug Rebate Program meeting, Chicago, IL, September 2006
- "OIG Update: Review of 340B Drug Prices," Keynote Address, 340B Coalition Annual Meeting, Washington, DC, July 2006
- "Recent Enhancements to the HRSA Files and the Implications for All 340B Stakeholders," DataNiche Associates Spring Medicaid Drug Rebate Meeting, Las Vegas, NV, March 2006
- "Office of Inspector General Update," Public Hospital Pharmacy Coalition Meeting, Las Vegas, NV, December 2005
- "Current Challenges Impacting the PHS 340B Drug Program," Institute for International Research's annual Medicaid Drug Rebate Program meeting, Chicago, IL, September 2005
- "Update from the OIG: Recent Evaluations of the 340B Program," DataNiche Associates Fall Medicaid Drug Rebate Meeting, San Francisco, CA, September 2005
- "Government Agencies and Private Entities: Interdependent Roles in Medicaid and 340B Pricing Enforcement," Ninth Annual 340B Coalition Conference, Washington, DC, July 2005
- "Office of Inspector General Update," Public Hospital Pharmacy Coalition Meeting, Las Vegas, NV, December 2004
- "An OIG Evaluation of the 340B Drug Pricing Program: Results and Implications for State Medicaid Programs," DataNiche Associates Fall Medicaid Drug Rebate Meeting, Stone Mountain, GA, September 2004
- "340B Integrity and Compliance Issues," Eighth Annual 340B Coalition Conference, Washington, DC, July 2004
- "340B Pricing Reviews: The View from the OIG," 340B Coalition Annual Meeting, Washington, DC, July 2003

- "How to Avoid Double Discounting Through Cooperation Among HRSA, Medicaid Agencies and Drug Manufacturers," DataNiche Associates Fall Medicaid Drug Rebate Meeting, Lake Tahoe, NV, September 2001
- "AIDS Drug Assistance Program Cost Containment Strategies," 340B Coalition Conference, Washington, DC, July 2001
- "Non-FAMP and Other Barriers to 340B Subceiling Prices" and "340B and Medicaid Drug Price Calculations," Fifth Annual 340B Coalition Conference, Washington DC, July 2001
- "Recent OIG Recommendations: AIDS Drug Assistance Program Cost Containment Strategies," DataNiche Associates Spring Medicaid Drug Rebate Meeting, Orlando, FL, March 2001

## SUBJECT MATTER EXPERT WORK

Depositions in last 4 years:

*Astra Zeneca vs.* ALAN MCCLAIN, in his official capacity as Commissioner of the Arkansas Insurance Department, August 2025

*South Lincoln Hospital District d/b/s South Lincoln Medical Center vs. ACI 340B Management Company*, November 2022, January 2023


A list of cases that have been settled is available upon request; active litigation is subject to confidentiality terms.