UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

AbbVie Inc., *et al.*,

*Plaintiffs,*

v.

Gentner Drummond, in his official
capacity as Attorney General of
Oklahoma,

*Defendant.*

No.  5:25-cv-726-PRW

## THE STATE OF OKLAHOMA'S MOTION FOR JUDGMENT ON THE PLEADINGS

Garry M. Gaskins, II, OBA 20212
  *Solicitor General*
Zach West, OBA 30768
  *Director of Special Litigation*

Office of Attorney General
  State of Oklahoma
313 N.E. 21st Street
Oklahoma City, OK 73105
Phone: (405) 521-3921
Garry.Gaskins@oag.ok.gov
Zach.West@oag.ok.gov

Will Flanagan, OBA 35110
  *Assistant Solicitor General*
Addison Gaut, OBA 36457
  *Assistant Attorney General*

Office of Attorney General
  State of Oklahoma
313 N.E. 21st Street
Oklahoma City, OK 73105
Phone: (405) 521-3921
William.Flanagan@oag.ok.gov
Addison.Gaut@oag.ok.gov

*Counsel for Defendant*

September 4, 2025

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

BACKGROUND ................................................................................................... 2

      **A.**  The creation of the 340B Program ..........................................2

      **B.**  HHS guidance letters .............................................................5

      **C.**  Accounting models for distribution .......................................5

      **D.**  Resulting litigation ................................................................6

      **E.**  States' responses ...................................................................7

      **F.**  Oklahoma law .......................................................................7

      **G.**  The present lawsuit ...............................................................8

ARGUMENT AND AUTHORITIES ................................................................ 8

  **I.**  ABBVIE HAS NOT PLAUSIBLY ALLEGED THAT HB 2048 IS PREEMPTED. ........ 9

      **A.**  Congress has not preempted the field. ................................. 11

      **B.**  HB 2048 does not conflict with federal law. ............................. 13

  **II.**  ABBVIE HAS NOT PLAUSIBLY ALLEGED THAT HB 2048 EFFECTS A TAKING. 17

      **A.**  HB 2048 is not a per se taking. .................................................. 18

      **B.**  AbbVie has not plausibly alleged a regulatory taking. ............................20

  **III.**  HB 2048 IS NOT VAGUE. ...................................................................22

CONCLUSION ......................................................................................25

# TABLE OF AUTHORITIES

## Cases

*AbbVie Inc. v. Bailey,*
   No. 4:24-cv-996, 2025 WL 1918948 (E.D. Miss. July 11, 2025) ................................. 8, 18, 20

*AbbVie Inc. v. Fitch,*
   No. 1:24-CV-184-HSO-BWR, 2024 WL 3503965 (S.D. Miss. July 22, 2024) ...8, 12, 14, 19,
                                                                                                            20, 21

*AbbVie Inc. v. Skrmetti,*
   No. 3:25-CV-00519, 2025 WL 1805271 (M.D. Tenn. June 30, 2025).... 8, 12, 14, 17, 18, 19,
                                                                                                            20, 23, 24

*Andrus v. Allard,*
   444 U.S. 51 (1979).....................................................................................................21

*Am. Hosp. Ass'n v. Becerra,*
   596 U.S. 724 (2022).....................................................................................................3

*Ark. Game & Fish Comm'n v. United States,*
   568 U.S. 23 (2012).....................................................................................................21

*Arizona v. United States,*
   567 U.S. 387 (2012).............................................................................................. 11, 12

*Astra USA, Inc. v. Santa Clara Cnty.,*
   563 U.S. 110 (2011).............................................................................................. 2, 16

*AstraZeneca Pharm. LP v. Fitch,*
   766 F. Supp. 3d 657 (S.D. Miss. 2024)................................................................... 8, 19

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009)................................................................................................ 8, 9

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007)....................................................................................................8

*Caldara v. City of Boulder,*
   955 F.3d 1175 (10th Cir. 2020) ................................................................................11

*California v. ARC Am. Corp.,*
   490 U.S. 93 (1989)...................................................................................................10

*Carolina Youth Action Project v. Wilson,*
   60 F.4th 770 (4th Cir. 2023) .....................................................................................24

*Cedar Point Nursery v. Hassid,*
   594 U.S. 139 (2021)............................................................................................ 17, 18

*Cipollone v. Liggett Grp., Inc.,*
   505 U.S. 504 (1992)...................................................................................................10

*Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*,
508 U.S. 602 (1993)......................................................................................21

*Connolly v. Pension Benefit Guar. Corp.*,
475 U.S. 211 (1986)......................................................................................22

*Cramp v. Bd. of Pub. Instruction*,
368 U.S. 278 (1961)......................................................................................22

*DeCanas v. Bica*,
424 U.S. 351 (1976)......................................................................................11

*Eli Lilly & Co. v. Kennedy*,
No. 24-cv-03220, 2025 WL 1423630 (D.D.C. May 15, 2025) ...........................5, 6

*Fla. Lime & Avocado Growers, Inc. v. Paul*,
373 U.S. 132 (1963)......................................................................................11

*Genesis Health Care, Inc. v. Becerra*,
701 F. Supp. 3d 312 (D.S.C. 2023) .................................................................4

*Haw. Hous. Auth. v. Midkiff*,
467 U.S. 229 (1984)......................................................................................20

*Hejira Corp. v. MacFarlane*,
660 F.2d 1356 (10th Cir. 1981) .....................................................................23

*Hillsborough Cnty. v. Automated Med. Labs., Inc.*,
471 U.S. 707 (1985)......................................................................................10

*Horne v. Dep't of Agric.*,
576 U.S. 350 (2015)......................................................................................19

*Jordan v. De George*,
341 U.S. 223 (1951)......................................................................................22

*Kan. Penn Gaming, LLC v. Collins*,
656 F.3d 1210 (10th Cir. 2011) .......................................................................9

*Kelo v. City of New London*,
545 U.S. 469 (2005)...............................................................................18, 20

*Lingle v. Chevron USA Inc.*,
544 U.S. 528 (2005)...........................................................................20, 21, 22

*Los Alamos School Bd. v. Wugalter*,
557 F.2d 709 (10th Cir. 1977) .......................................................................14

*Minn. Ass'n of Health Care Facilities v. Minn Dep't of Pub. Welfare*,
742 F.2d 442 (8th Cir. 1984)..........................................................................19

*Mount Olivet Cemetery Ass'n v. Salt Lake City*,
164 F.3d 480 (10th Cir. 1998) .......................................................................10

iv

*Murr v. Wisconsin*,
    582 U.S. 383 (2017) ........................................................................................ 21

*Neitzke v. Williams*,
    490 U.S. 319 (1989) .......................................................................................... 9

*Novartis Pharms. Corp. v. Johnson*,
    102 F.4th 452 (D.C. Cir. 2024) ..................................................... 3, 4, 5, 7, 13, 16

*Oneok, Inc., v. Learjet, Inc.*,
    575 U.S. 373 (2015) ...................................................................................... 9, 14

*Parker v. Brown*,
    317 U.S. 341 (1943) .......................................................................................... 9

*Paul v. Monts*,
    906 F.2d 1468 (10th Cir. 1990) ........................................................................ 14

*PCMA v. Wehbi*,
    18 F.4th 956 (8th Cir. 2021) ............................................................................. 10

*Pharm. Rsch. & Mfrs. of Am. v. Bailey*,
    No. 2:24-CV-04144-MDH, 2025 WL 644281 (W.D. Mo. Feb. 27, 2025) ............................. 8

*Pharm. Rsch. & Mfrs. of Am. v. Fitch*,
    No. 1:24-cv-160-HSO-BWR, 2024 WL 3277365 (S.D. Miss. July 1, 2024) .................... 8, 18

*Pharm. Rsch. & Mfrs. of Am. v. McClain*,
    95 F.4th 1136 (8th Cir. 2024) ......................................... 8, 12, 13, 15, 16, 18, 20

*Pharm. Rsch. & Mfrs. of Am. v. Morrisey*,
    760 F. Supp. 3d 439 (S.D.W.V. 2024) ............................................................... 8, 14

*Pharm. Rsch. & Mfrs. of Am. v. Murrill*,
    No. 6:23-CV-00997, 2024 WL 4361597 (W.D. La. Sept. 30, 2024) ......... 8, 18, 19, 20, 22, 23

*Powerex Corp. v. Reliant Energy Servs., Inc.*,
    551 U.S. 224 (2007) ........................................................................................ 24

*Ruckelshaus v. Monsanto Co.*,
    467 U.S. 986 (1984) ............................................................................... 18, 19, 21

*S & S Pawn Shop Inc. v. City of Del City*,
    947 F.2d 432 (10th Cir. 1991) .......................................................................... 25

*Sanofi Aventis U.S. LLC v. HHS*,
    58 F.4th 696 (3d Cir. 2023) ...................................................................... 2, 15, 16

*Sanofi-Aventis U.S., LLC v. HHS*,
    570 F. Supp. 3d 129 (D.N.J. 2021) ..................................................................... 2

*Tarrant Reg'l Water Dist. v. Herrmann*,
    656 F.3d 1222 (10th Cir. 2011) ........................................................................ 10

*Tenn. Scrap Recyclers Ass'n v. Bredesen*,
  556 F.3d 442 (6th Cir. 2009)..............................................................21

*United States v. Solomon*,
  95 F.3d 33 (10th Cir. 1996)................................................................23

*Valancourt Books v. Garland*,
  82 F.4th 1222 (D.C. Cir. 2023)..........................................................19

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*,
  455 U.S. 489 (1982)............................................................................23

*Warnick v. Cooley*,
  895 F.3d 746 (10th Cir. 2018) .............................................................9

## Statutes

42 U.S.C. § 1396r-8 ...................................................................................2

42 U.S.C. § 256b ........................................... 2, 3, 4, 5, 7, 12, 13, 16, 17

OKLA. STAT. tit. 36, § 5401, *et seq.*..........................8, 9, 13, 20, 22, 23, 24

## Rules and Regulations

59 Fed. Reg. 25,110 (May 13, 1994)..........................................................5

61 Fed. Reg. 43,549 (Aug. 23, 1996) ...................................................5, 17

75 Fed. Reg. 10,272 (Mar. 5, 2010) ....................................................6, 18

## Other Authorities

GOV'T ACCOUNTABILITY OFF., *Drug Pricing: Manufacturer Discounts in the 340B Program Offer
  Benefits, but Federal Oversight Needs Improvement*
  17–18 (GAO-11-836, Sept. 2011)........................................................3

Joel M. Hamme, *et al.*,
  2 HEALTH L. PRAC. GUIDE § 26A:20 (2024) ......................................7

Nicholas C. Fisher, *The 340B Program: A Federal Program in Desperate Need of Revision After Two-
  And-A-Half Decades of Uncertainty*,
  22 J. HEALTH CARE L. & POL'Y 25 (2019) .......................................2

**INTRODUCTION**

As the State of Oklahoma has already explained, Doc. 26, drug manufacturers that choose to participate in Medicare Part B and Medicaid must also participate in the 340B Drug Pricing Program ("340B Program" or "Program"), which requires manufacturers to provide a discount to certain healthcare providers. Many of those covered providers choose to contract with pharmacies to provide patients with prescriptions. Under the terms of those contracts, the providers can receive the Program discount for prescriptions filled in the contracted pharmacies. Around five years ago, however, manufacturers began to restrict the number of contracted pharmacies where patients can receive 340B discounted drugs. Numerous states have pushed back. Oklahoma enacted House Bill 2048 ("HB 2048"), which prohibits manufacturers from limiting covered entities in Oklahoma from contracting with outside pharmacies to provide their patients with 340B discounted drugs.

With the enactment of HB 2048, AbbVie and its fellow manufacturers have lost a policy debate. With this lawsuit, AbbVie asks this Court to override the democratic process. Although the administration of healthcare is complex, the core of this case is simple, and legal. Both parties agree that federal law is silent as to the delivery of 340B discounted drugs. Because federal law is silent in an area of law traditionally left to the states, Oklahoma's regulation of *where* manufacturers must deliver 340B drugs is not preempted, as numerous courts have found. Similarly, HB 2048 does not violate the Takings Clause because it merely regulates contractual relationships that AbbVie voluntarily entered. And HB 2048's meaning is readily ascertainable, not unconstitutionally vague. AbbVie's allegations to the contrary are not plausible. Thus, this Court should grant the State judgment and dismiss AbbVie's claims.

1

## BACKGROUND

### A.  The creation of the 340B Program

In 1992, Congress established the 340B Program as part of the Veterans Health Care Act, and Congress amended it in 2010. *Sanofi Aventis U.S. LLC v. HHS*, 58 F.4th 696, 699 (3d Cir. 2023). The Program was meant to address an "unintended consequence" of the Medicaid Drug Rebate Program (enacted in 1990) that accidentally ended the common manufacturer practice of giving discounts to hospitals and safety-net providers. Nicholas C. Fisher, *The 340B Program: A Federal Program in Desperate Need of Revision After Two-and-a-Half Decades of Uncertainty*, 22 J. HEALTH CARE L. & POL'Y 25, 28–30 (2019). Congress was unwilling to "continue to allow" vulnerable populations "to remain unprotected against manufacturer price increases." H.R. REP. 102-384, at 11. Thus, it created the 340B Program "to stretch scarce Federal resources as far as possible." *Id.* at 12. This Program allows covered entities to access discounts to "reach[] more eligible patients and provid[e] more comprehensive services." *Id.*

The 340B Program is based on a voluntary "opt-in mechanism." *Astra USA, Inc. v. Santa Clara Cnty.*, 563 U.S. 110, 115 (2011). To access Medicare Part B and Medicaid markets, drug makers "must offer their drugs at a discount to certain healthcare providers." *Id.* (citing 42 U.S.C. §§ 256b, 1396r-8(a)(1), (5)). The discount is established by statute and implemented in agreements between the Secretary of Health and Human Services ("HHS") and each drug manufacturer that cap prices for "covered outpatient drugs." 42 U.S.C. § 256b(a)(1). "[T]he average discount rate appears to be between 25 and 50 percent.*" Sanofi-Aventis U.S. v. HHS*,

570 F. Supp. 3d 129, 208 (D.N.J. 2021), *aff'd in part, rev'd in part on other grounds*, 58 F.4th at 696.[1]

Providers in the 340B Program are called "covered entities," and they typically serve "low-income and rural persons." *Sanofi*, 58 F.4th at 699. "Covered entities" must meet narrow statutory categories such as "rural referral centers[] and hospitals that primarily serve low-income patients." *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 456 (D.C. Cir. 2024) (citing 42 U.S.C. § 256b(a)(4)). Unsurprisingly, these types of healthcare providers are less profitable than providers that cater mostly to affluent patients. If left exclusively to market whims, the number of covered entities would dwindle—decreasing the healthcare services available to the impoverished and rural. As the Supreme Court put it, "340B hospitals perform valuable services for low-income and rural communities but have to rely on limited federal funding for support." *Am. Hosp. Ass'n v. Becerra*, 596 U.S. 724, 738 (2022).

The 340B Program allows covered entities to provide these critical services in several ways. First, the Program grants them extra revenue: "they turn a profit when insurance companies reimburse them at full price for drugs that they bought at the 340B discount." *Sanofi*, 58 F.4th at 699. Second, it enables them to provide steep discounts to uninsured patients. *See* GOV'T ACCOUNTABILITY OFF., *Drug Pricing: Manufacturer Discounts in the 340B Program Offer Benefits, but Federal Oversight Needs Improvement* 17–18 (GAO-11-836, Sept. 2011). The extra revenue helps make covered entities "profitable," thereby "stretch[ing] scarce [f]ederal resources as far as possible" to "provide more services to a larger population of under-served patients." *Genesis Health Care, Inc. v. Becerra*, 701 F. Supp. 3d 312, 316 (D.S.C.

---

[1] AbbVie mentions the possibility of drugs costing just a penny after the Program discount, but that is misleading. See Okla. Resp., Doc. 14, *Novartis v. Drummond*, No. 25-cv-727, at 3 n.1.

2023) (quoting H.R. Rep. 102-384(II), at 12 (1992)). The Program allows covered entities to expand capacity, and it incentivizes the creation of more entities to serve the underserved.

Congress limited the Program in key respects. First, Congress defined "covered entities" narrowly. 42 U.S.C. § 256b(a)(4). Second, covered entities are prohibited from "resell[ing] or otherwise transfer[ring] the drug to a person who is not a patient of the entity"—a practice referred to as "diversion." *Novartis*, 102 F.4th at 456. Third, manufacturers are protected from having to provide both a 340B discount and a Medicaid rebate. Covered entities must assist the Health Resources & Services Administration ("HRSA") in ensuring that this does not happen. *Id.* In short, the Program discounts only apply to patients of covered entities, and states are not allowed to add a Medicaid rebate on top of the 340B discount.

Congress also created compliance measures. Both manufacturers and the Secretary of HHS may audit covered entities. 42 U.S.C. § 256b(a)(5)(C). If the Secretary finds that the covered entity illegally resold discounted drugs or did not take the steps needed to prevent duplicate discounts, the Secretary may require a covered entity to pay "a monetary penalty to a manufacturer"—and in extreme cases even kick the covered entity out of the 340B Program. *Id.* § 256b(d)(2)(B)(v)(I), (II). And when a dispute arises between covered entities and manufacturers about pricing, payment, diversion, or double-discounting, the 340B Program requires an "[a]dministrative dispute resolution process." *Id.* § 256b(d)(3). To use that process, manufacturers must first audit a covered entity. The administrative resolution of those claims constitutes "a final agency decision" that is subject to judicial review. *Id.* § 256b(d)(3)(C).

In sum, the 340B Program covers the scope of covered entities, their discounts, and compliance. It does not speak to how or where covered entities may receive the covered drugs.

4

### B. HHS guidance letters

At times, HHS has sought to fill this statutory gap. Although the HHS Secretary lacks rulemaking authority over most of the 340B Program, HRSA has issued three guidance letters that "address the distribution of drugs from manufacturers to covered entities." *Novartis*, 102 F.4th at 456. Those letters evolved with the shifting landscape of prescription drugs. In 1992, HRSA indicated that covered entities may use a "purchasing agent" to access covered drugs. Final Notice, 59 Fed. Reg. 25,110, 25,113 (May 13, 1994). Per the guidance, "manufacturers may ship discounted drugs to this agent, which then must ship them to the covered entity for dispensing to patients." *Novartis*, 102 F.4th at 456. Then, in 1996, HRSA "stated that a covered entity without an in-house pharmacy may contract with a single outside pharmacy to dispense drugs at a single location." *Id.* at 457 (citing Notice, 61 Fed. Reg. 43,549, 43,550 (Aug. 23, 1996) ("1996 Guidance")). HRSA noted that if covered entities could not use outside pharmacies, they would face the "untenable dilemma" of choosing to invest in in-house pharmacies—"impossible" for many—or leaving the 340B Program. 1996 Guidance at 43,555. Finally, in 2010, HRSA opined that covered entities may contract with an unlimited number of outside pharmacies, regardless of whether the entities had in-house pharmacies. Notice Regarding 340B Drug Pricing Program—Contract Pharmacy Services, 75 Fed. Reg. 10,272, 10,272–73 (Mar. 5, 2010); *Novartis*, 102 F.4th at 457.

### C. Accounting models for distribution

Over the years, the model for distributing and tracking 340B Program drugs evolved. When a 340B hospital relies on a contract pharmacy, it often relies on the "replenishment model." *Eli Lilly & Co. v. Kennedy*, No. 24-cv-03220, 2025 WL 1423630, at *2 (D.D.C. May 15,

2025). The replenishment model allows a pharmacy to dispense a drug from its inventory to a covered entity's patient instead of having to wait on orders of 340B Program discounted drugs to arrive. Otherwise, the pharmacy would have to maintain two separate inventories of drugs: one for patients from covered entities and another for other patients. AbbVie refers to this latter alternative arrangement as the pre-purchased inventory model. Doc. 1, ¶ 57

Under the replenishment model, a covered entity establishes a relationship with a pharmacy. Doc. 1, ¶ 55. Consider hypothetical Drug A. The contract pharmacy dispenses Drug A from its general inventory for which it paid the manufacturer full price. *Eli Lilly*, 2025 WL 1423630, at *2; Doc. 1, ¶ 59. A third-party administrator then employs software that compares information from the pharmacy with information from the covered entity to identify 340B-eligible patients who purchased Drug A from the pharmacy in connection with care at the covered entity. Doc. 1, ¶ 61. Once a full package of Drug A is dispensed to covered entity patients at the pharmacy, the covered entity then purchases an order of Drug A at the 340B discounted price to replenish the pharmacy's stock. Doc. 1, ¶ 59. Although the drugs are sold at the pharmacy, it is the covered entity that purchases the drugs at the 340B price. As with any model, the covered entity must ensure that it only receives the Program discount for sales of drugs to its patients. And HHS audits covered entities to ensure that they and their pharmacies are complying with Program rules. 42 U.S.C. § 256b(a)(5)(C).

### D. Resulting litigation

About five years ago, manufacturers decided they would no longer agree to covered entities' use of multiple contract pharmacies. They claimed that "contract pharmacies were driving up duplicate discounting and diversion." *Sanofi*, 58 F.4th at 700. Manufacturers began

to limit the covered entities' use of contract pharmacies. For example, AbbVie only allows covered entities that lack an in-house pharmacy to use one contract pharmacy and only if it submits claims data. Doc. 1, ¶ 79. HHS then took action to prohibit those policies. *Sanofi*, 58 F.4th at 701. In the resulting litigation, the Third Circuit and D.C. Circuit held that the text of 340B is "silent about delivery." *Id.* at 703; *Novartis*, 102 F.4th at 460. Thus, the courts held that the statute itself does not "requir[e] delivery of discounted drugs to an unlimited number of contract pharmacies." *Sanofi*, 58 F.4th at 706. HHS's action was therefore deemed invalid.

### E.  States' responses

As manufacturers began to impose policies limiting covered entities' ability to contract with outside pharmacies, State grew concerned that "covered entities dependent on contract pharmacies [had become] unable to serve patients in need." *Pharm. Rsch. & Mfrs. of Am. v. McClain*, 95 F.4th 1136, 1139 (8th Cir. 2024). Thus, many states enacted laws that "prohibit[] manufacturers from limiting covered entities' ability to contract with outside pharmacies." *Id.* In response, drug companies filed lawsuits across the country challenging these laws. And across the country, the manufacturers have lost. Repeatedly. *See, e.g.*, *McClain*, 95 F.4th at 1146.[2]

### F.  Oklahoma law

Oklahoma lawmakers shared the other states' concerns. In response, Oklahoma

---

[2] *See also Pharm. Rsch. & Mfrs. of Am. v. Fitch*, No. 1:24-cv-160-HSO-BWR, 2024 WL 3277365, at *12 (S.D. Miss. July 1, 2024) (*Fitch I*); *AbbVie v. Fitch*, No. 1:24-CV-184-HSO-BWR, 2024 WL 3503965, at *9 (S.D. Miss. July 22, 2024) (*Fitch II*); *AstraZeneca Pharm. LP v. Fitch*, 766 F. Supp. 3d 657, 660 (S.D. Miss. 2024) (*Fitch III*); *Pharm. Rsch. & Mfrs. of Am. v. Bailey*, No. 2:24-CV-04144-MDH, 2025 WL 644281, at *3 (W.D. Mo. Feb. 27, 2025); *AbbVie Inc. v. Skrmetti*, No. 3:25-CV-00519, 2025 WL 1805271, at *19 (M.D. Tenn. June 30, 2025); *Pharm. Rsch. & Mfrs. of Am. v. Murrill*, No. 6:23-CV-00997, 2024 WL 4361597, at *15 (W.D. La. Sept. 30, 2024). *But see Pharm. Rsch. & Mfrs. of Am. v. Morrisey*, 760 F. Supp. 3d 439, 446 (S.D.W.V. 2024).

enacted its own version of the contract pharmacy laws now seen nationwide. Codified at OKLA. STAT. tit. 36, § 5401, *et seq.*, HB 2048 states that "[a] manufacturer shall not deny, restrict, prohibit, or otherwise interfere with, either directly or indirectly, the acquisition of a 340B drug by, or delivery of a 340B drug to a 340B entity, unless such receipt is prohibited by [HHS]." *Id.* § 5403(A). Similarly, "[a] manufacturer shall not interfere with a pharmacy contracted with a 340B entity." *Id.* § 5403(B). Together, these provisions prohibit manufacturers from stopping covered entities in Oklahoma from contracting with pharmacies to provide their patients 340B drugs. HB 2048 also protects covered entities from being subject to onerous conditions to receive 340B drugs at contract pharmacies. *Id.* § 5402.

Enforcement of HB 2048 is split between the Oklahoma Insurance Department and the Oklahoma Attorney General. *Id.* § 5404. The Attorney General may establish rules and regulations interpreting HB 2048, and he may impose civil fines up to $10,000 for each violation. *Id.* § 5404(B). AbbVie repeatedly raises the specter of criminal liability, *e.g.*, Doc. 1, ¶ 108, but nothing in HB 2048 grants the Attorney General authority to seek criminal penalties.

## G. The present lawsuit

Here, AbbVie alleges that HB 2048 is preempted, constitutes an unlawful taking, and is unconstitutionally vague. As numerous courts have already decided, however, these claims fail. For the reasons provided below, this Court should grant the State judgment on all claims.

## ARGUMENT AND AUTHORITIES

A complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Only factual assertions must be accepted as

true, not labels, legal conclusions, unreasonable deductions of fact, or "naked assertions devoid of further enhancement." *Iqbal*, 556 U.S. at 678–79 (cleaned up). When ruling on a motion for judgment, "a court should disregard all conclusory statements of law and consider whether the remaining *specific* factual allegations, if assumed to be true, plausibly suggest the defendant is liable." *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011) (emphasis added). Moreover, determining whether a plaintiff's claims are plausible "requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. A claim for relief is implausible when the pleadings "do not permit the court to infer more than the mere possibility of misconduct." *Warnick v. Cooley*, 895 F.3d 746, 751 (10th Cir. 2018) (quoting *Iqbal*, 556 U.S. at 679). When "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations," a complaint "must be dismissed, without regard to whether it is based on an outlandish legal theory or on a close but ultimately unavailing one." *Neitzke v. Williams*, 490 U.S. 319, 327 (1989) (citation omitted).

## I.    ABBVIE HAS NOT PLAUSIBLY ALLEGED THAT HB 2048 IS PREEMPTED.

Under the Supremacy Clause, "the Laws of the United States" take priority over conflicting state laws. U.S. CONST. art. VI, cl. 2. But "the states are sovereign, save only as Congress may constitutionally subtract from their authority." *Parker v. Brown*, 317 U.S. 341, 351 (1943). Congress can preempt state laws in several ways. The simplest way is "through express language in a statute." *Oneok, Inc., v. Learjet, Inc.*, 575 U.S. 373, 376 (2015). Critically, AbbVie has not pointed to any express preemption language here.

When a statute does not refer to preemption, a plaintiff must demonstrate that Congress "implicitly pre-empt[ed]" the state law. *Id.* That can be done through field or conflict

preemption. *Id.* at 376–77. Field preemption occurs only when "Congress has forbidden the State to take action in the field that the federal statute pre-empts." *Id.* Conflict preemption occurs when "compliance with both state and federal law is impossible," or when state law is "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *California v. ARC Am. Corp.*, 490 U.S. 93, 100–01 (1989) (citation omitted). A plaintiff "bears the burden of showing with specificity that Congress intended to preempt state law." *Mount Olivet Cemetery Ass'n v. Salt Lake City*, 164 F.3d 480, 489 n.4 (10th Cir. 1998).

Because preemption intrudes on the States' sovereign ability to govern, any preemption analysis "start[s] with the assumption that the historic police powers of the States [are] not to be superseded by . . . [a] Federal Act unless that [is] the clear and manifest purpose of Congress." *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992) (citation omitted). This presumption applies particularly to "state or local regulation of matters related to health and safety." *Hillsborough Cnty. v. Automated Med. Lab'ys, Inc.*, 471 U.S. 707, 715 (1985). As a result, the Tenth Circuit "is especially reluctant to find preemption in matters of longstanding state regulation." *Tarrant Reg'l Water Dist. v. Herrmann*, 656 F.3d 1222, 1242 (10th Cir. 2011).

HB 2048 prohibits manufacturers from refusing to deliver 340B discounted drugs to contract pharmacies, in order "to maximize covered-entity patients' access to drugs for which the manufacturers have already agreed to provide a discount." *AbbVie Inc. v. Fitch*, No. 1:24-CV-184, 2024 WL 3503965, at *9 (S.D. Miss. July 22, 2024) (*Fitch II*). By regulating the distribution of drugs to pharmacies, the law affects "the practice of pharmacy" which "is an area traditionally left to state regulation." *PCMA v. Wehbi*, 18 F.4th 956, 972 (8th Cir. 2021). Plainly then, HB 2048 regulates "matters related to health and safety." *Hillsborough Cnty.*, 471

U.S. at 715. AbbVie has not attempted to argue otherwise. When faced with similar statutes, courts have applied the presumption against preemption. *McClain*, 95 F.4th at 1143; *Fitch II*, 2024 WL 3503965, at \*9; *AbbVie Inc. v. Skrmetti*, No. 3:25-CV-00519, 2025 WL 1805271, at \*12 (M.D. Tenn. June 30, 2025). This Court should do the same.

### A. Congress has not preempted the field.

Field preemption requires "a demonstration that complete ouster of state power including state power to promulgate laws not in conflict with federal laws was the clear and manifest purpose of Congress." *DeCanas v. Bica*, 424 U.S. 351, 357 (1976), *superseded by statute on other grounds as recognized in Arizona v. United States,* 567 U.S. 387, 404 (2012). Nothing less than an "unambiguous congressional mandate" will support field preemption. *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 147 (1963). No court analyzing similar state laws has held that such a law is field preempted. Needless to say, AbbVie faces a high burden to allege field preemption in such a way that renders it plausible, legally. AbbVie has not done so.

Start with the text of the 340B Program statute. The Program regulates the price paid by certain healthcare providers to receive drugs for their patients. More specifically, it caps the price that participating manufacturers may offer covered entities, 42 U.S.C. § 256b(a)(1), and then it imposes requirements on those entities, *id.* § 256b(a)(5). Those requirements include a prohibition on diversion as well as a prohibition on duplicate discounts. *Id.* § 256b(a)(5)(A), (B). To enforce those requirements, the statute provides for audits and grants the HHS Secretary the ability to impose monetary penalties. *Id.* § 256b(a)(5)(C), (D). Thus, the statute addresses the field of drug pricing—at least in relation to certain healthcare providers, drugs, and manufacturers. It does not even fully occupy that field.

The 340B Program is "silent about delivery conditions." *Novartis*, 102 F.4th at 460; *Sanofi*, 58 F.4th at 703. And HB 2048 merely regulates the delivery of drugs. Specifically, it prohibits manufacturers from "deny[ing], restrict[ing], prohibit[ing], or otherwise interfer[ing] with . . . the acquisition of a 340B drug . . . or [the] delivery" of said drug. OKLA. STAT. tit. 36, § 5403(A). It also states that "[a] manufacturer shall not interfere with a pharmacy contracted with a 340B entity." *Id.* § 5403(B). In effect, HB 2048 ensures that covered entities can contract with outside pharmacies and receive the covered drugs at those pharmacies. The law does not regulate or affect the price of drugs at all. *See McClain*, 95 F.4th at 1145. It certainly does not interfere with the discount rates set under the 340B Program. HB 2048 is merely concerned with ensuring that the covered entity can receive covered drugs at locations accessible to their patients. Oklahoma has not "enter[ed] . . . an area the Federal Government has reserved for itself." *Arizona*, 567 U.S. at 402. Accordingly, HB 2048 is not field preempted.

AbbVie's assertion that the Program is so comprehensive that any state regulation touching on it impermissibly "regulate[s] Congress's creation[]" cannot be reconciled with the Program's text. Doc. 1, ¶¶ 135–36. As the Eighth Circuit found, "[p]harmacies have always been an essential part of the 340B Program" and yet "the text of 340B is 'silent about delivery' of drugs to patients." *McClain*, 95 F.4th at 1143 (citation omitted). This silence—combined with "the practice of pharmacy [being] an area traditionally left to state regulation"—"indicates that Section 340B is not intended to preempt the field." *Id.* (citation omitted).

AbbVie primarily relies on the one court to go against the grain. Doc. 1, ¶¶ 131–32 (citing *Pharm. Rsch. & Mfrs. of Am. v. Morrisey*, 760 F. Supp. 3d 439, 456 (S.D.W.V. 2024)). But even that case did not find field preemption. *Id.* And that court's (erroneous) holding that a

similar West Virginia state law regulates price as opposed to delivery does not overcome the plain text of HB 2048. *Morrisey,* in analyzing conflict preemption, premised its view on the basis that manufacturers "already deliver" their "drug products to contract pharmacies." 760 F. Supp. 3d at 456. This is irrelevant. Pharmacies are not covered entities, and they do not receive the 340B Program discount. With or without HB 2048, pharmacies will purchase non-340B drugs from manufacturers. Oklahoma law merely requires manufacturers to ship drugs purchased by covered entities to contract pharmacies. It does not deal with pricing.

AbbVie's attack on the replenishment accounting model does not change this conclusion. Doc. 1, ¶¶ 58–69. HB 2048 speaks to delivery alone, whether the delivery happens before or after a drug is dispensed. *See Fitch II*, 2024 WL 3503965, at *13–14. Consider a pharmacy and covered entity that decline to use the replenishment model. There, the entity purchases the drugs from the manufacturer and has them shipped to the pharmacy. Upon receipt, the pharmacy dispenses the drug to the entity's patients. There can be no question, in that scenario, that HB 2048's requirement that the manufacturer send drugs to the pharmacy is regulating delivery. The only difference with the replenishment model is that the drug is replenished after the pharmacy has dispensed the drug to the entity's patients. In both cases, "[t]he amount of the discount is not at issue and is not affected by the state scheme." *Skrmetti*, 2025 WL 1805271, at *18 (rejecting AbbVie's replenishment argument because the state law merely "impos[ed] restrictions on where [AbbVie] is willing to deliver drugs"). Accordingly, this Court should grant judgment to Oklahoma on AbbVie's field preemption claim.

## B. HB 2048 does not conflict with federal law.

Conflict preemption exists only where it is "impossible" to comply with state and

federal law or where state law is "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Oneok*, 575 U.S. at 377 (citation omitted). HB 2048 produces no such conflict. As a matter of law, this claim should be dismissed.

AbbVie first raises the same arguments it raised with field preemption, namely, that HB 2048 "change[]s the requirements" placed by the 340B Program on manufacturers. Doc.1, ¶ 15; Doc. 7 at 13. This argument mistakenly assumes that congressional "silen[ce] about delivery," *Sanofi*, 58 F.4th at 703, preempts state regulation. But the Tenth Circuit has emphasized that "Congressional silence will not be presumed to mandate preemption." *Paul v. Monts*, 906 F.2d 1468, 1475 n.8 (10th Cir. 1990). "It will not be presumed that a federal statute was intended to supersede . . . the power of the state [without] clear manifestation of intent to do so." *Los Alamos Sch. Bd. v. Wugalter*, 557 F.2d 709, 714 (10th Cir. 1977). As the Program is "silent about delivery" and does not "mention contract pharmacies," 340B leaves room for states to regulate. *Sanofi*, 58 F.4th at 703. This is reinforced by the Eighth Circuit's conclusion that "Congress was aware of the role of pharmacies and state pharmacy law in implementing 340B." *McClain*, 95 F.4th at 1144. HB 2048 does not conflict with the Program.

Nor does HB 2048 interfere with the 340B Program's enforcement scheme. HB 2048's enforcement mechanisms do not conflict with the Program because the two statutes apply to different fields. Like Novartis's challenge, AbbVie relies on *Astra USA, Inc. v. Santa Clara County*, 563 U.S. 110 (2011)*,* without acknowledging that *Astra* examined only whether a covered entity could sue manufacturers for overcharging, as opposed to a preemption claim. Doc. 1, ¶ 4. *Astra* does not stand for the proposition that all decisions possibly touching on the 340B Program must be made by HHS. *Cf. Sanofi*, 58 F.4th at 703. Instead, it recognized

14

only that Congress created an "administrative framework . . . for covered entities complaining of '*overcharges* and other violations of the discounted *pricing requirements*.'" *Astra USA*, 563 U.S. at 122 (quoting 42 U.S.C. § 256b(d)(1)(A) (emphases added)). *Astra* does not apply here.

In enforcing HB 2048, Oklahoma will have nothing to do with "pricing requirements." *Id.* Oklahoma adjudicators will only be asked to decide (1) whether manufacturers delivered the drugs to where covered entities wanted them delivered, or (2) whether manufacturers imposed certain discriminatory requirements on delivery. Only those two acts potentially create liability under HB 2048. And even *Astra* seems to leave room for assertions that drugmakers "violated a[] substantive obligation arising only from" something independent of the "340B ceiling price." *Id.* at 118–19. As any lawsuits under HB 2048 will focus on delivery, those suits will not be attempts to force manufacturers to comply with the federal Program. By the same token, the Program's enforcement process says nothing about delivery, so that process will not overlap with Oklahoma proceedings. *See, e.g.*, *Novartis*, 102 F.4th at 460.

Enforcement of HB 2048 will not require Oklahoma to adjudicate federal law. HB 2048's enforcement concerns "activity"—delivery—that "falls" beyond 340B's "purview." *McClain*, 95 F.4th at 1145. AbbVie's stated concern that it might defend itself in a potential HB 2048 proceeding by arguing that the entity ordering drugs was engaged in diversion or was ineligible for 340B discounts does not create conflict preemption. As for the defense that the healthcare provider was not actually a covered entity, that list is available online,[3] and HB 2048 has no effect. Thus, there is no conflict with an Oklahoma adjudicator determining whether

---

[3] HRSA, *Office of Pharmacy Affairs 340B OPAIS: Search Covered Entities*, https://340bopais.hrsa.gov/SearchCe.

an entity is a covered entity. And AbbVie's concern about the hypothetical where it chooses to stop offering 340B discounts to a covered entity is illusory. Section 340B's anti-diversion provisions are enforced either by HRSA directly or after the fact through the ADR process. 42 U.S.C. §§ 256b(d)(2)(B)(v) & (3). As such, any HB 2048 adjudication will not implicate diversion. Regardless, that a manufacturer might raise federal law in defense to a state claim does not mean the state law conflicts with federal law.

Similarly, Oklahoma law does not restrict access to the federal 340B dispute-resolution scheme. *Contra* Doc. 1, ¶ 141. AbbVie contends that because manufacturers must complete an audit before invoking the ADR process, HB 2048's bar on requiring claims data as a condition of delivering 340B drugs prevents it from initiating ADR. But when manufacturers wish to conduct an audit of a covered entity, they must demonstrate "reasonable cause," defined broadly to mean that a reasonable person could believe that a covered entity may have violated a statute. 61 Fed. Reg., 65,406, 65,409 (Dec. 12, 1996). This standard is "not overly burdensome[,]" *Skrmetti*, 2025 WL 1805271, at *15, and can be met merely by "[s]ignificant changes in quantities of specific drugs ordered by a covered entity" or "complaints from patients/other manufacturers about activities of a covered entity." 61 Fed. Reg., 65,406, 65,406. Here, AbbVie has failed to provide a single example of HRSA refusing a manufacturer's request to conduct an audit. Therefore, Abbvie "[has] not actually shown that [it] need[s] claims data and other documentation … in order either to request an audit or to attempt to resolve a dispute in good faith before proceeding to ADR." *Skrmetti*, 2025 WL 1805271, at *16. HB 2048 does not plausibly stop AbbVie from participating in the federal ADR process. This is an attempt to manufacture a conflict where there is none.

16

Finally, AbbVie attempts to distinguish *McClain* by arguing that the Eighth Circuit's view—that covered entities maintain title of the 340B drugs under the replenishment model— is not true in Oklahoma. Doc. 7 at 16. But the Eighth Circuit's conclusion did not rest on the belief that covered entities maintain title to drugs held at contract pharmacies. The logic of *McClain*'s analysis holds up regardless of whether covered entities maintain title. *See* 95 F.4th at 1143–46. Thus, other courts have followed *McClain* without predicating their holding on title. *See, e.g.*, *Pharm. Rsch. & Mfrs. of Am. v. Fitch*, No. 1:24-cv-160, 2024 WL 3277365, at *8– 12 (S.D. Miss. July 1, 2024) (*Fitch I*); *Pharm. Rsch. & Mfrs. of Am. v. Murrill*, No. 6:23-CV-00997, 2024 WL 4361597, at *4–9 (W.D. La. Sept. 30, 2024). It is irrelevant to Oklahoma law whether covered entities maintain title of drugs when using the replenishment model. If Congress passed a law banning the replenishment model, Oklahoma's law would operate unchanged. *AbbVie Inc. v. Bailey*, No. 4:24-cv-996, 2025 WL 1918948, at *8 (W.D. Mo. Feb. 24, 2025). Thus, there is no plausible preemption, and this Court should grant judgment to Oklahoma.

## II.    ABBVIE HAS NOT PLAUSIBLY ALLEGED THAT HB 2048 EFFECTS A TAKING.

The Fifth Amendment's Takings Clause directs that no "private property be taken for public use, without just compensation." U.S. CONST. amend. V. A taking may occur in the form of either a "per se physical taking" or a "regulatory taking." *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 147–49 (2021). AbbVie claims primarily that HB 2048 constitutes a physical taking, Doc. 1, ¶¶ 150–60, and "in the alternative" that HB 2048 constitutes "a partial regulatory taking." *Id.*, ¶¶ 160–62. Manufacturers have made these arguments in courts across the country, and every court to rule on it at the preliminary injunction stage has rejected it. *See, e.g.*, *Fitch II*, 2024 WL 3503965, at *18–20, *Skrmetti*, 2025 WL 1805271, at *19–20; *Murrill*, 2024

WL 4361597, at *13–15; *Astrazenca Pharms. LP v. Bailey*, No. 2:24-CV-04143, 2025 WL 644285, at *4–6 (W.D. Mo. Feb. 27, 2025). This Court should do the same.

**A. HB 2048 is not a per se taking.**

A per se taking occurs "[w]hen the government physically acquires private property for a public use." *Cedar Point*, 594 U.S. at 147. Crucially, "[e]quitable relief is not available to enjoin an alleged taking of private property for a public use, duly authorized by law, when a suit for compensation can be brought against the sovereign subsequent to the taking." *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1016 (1984). Here, AbbVie argues that Oklahoma is forcing AbbVie to sell its drugs at the 340B price under conditions that it would not voluntarily accept. Doc. 1, ¶ 156. But restricting the terms of a commercial sale is not the same as forcing the sale in the first place, and AbbVie cannot credibly or plausibly describe Oklahoma's law as "tak[ing] the property of *A* for the sole purpose of transferring it to . . . *B*." Doc. 1, ¶ 153 (quoting *Kelo v. City of New London*, 545 U.S. 469, 477 (2005)). HB 2048 neither authorizes the State to take any property nor compels any sales. It simply bars manufacturers from imposing certain restrictions on sales they were already making to covered entities. Trying to escape this conclusion, AbbVie implies that HB 2048 requires it to sell discounted drugs to pharmacies. Doc. 1, ¶¶ 45, 118. The law does no such thing. It defines "340B drug" in a way that prohibits pharmacies from purchasing drugs at the 340B discount. OKLA. STAT. tit. 36, §§ 5401(1), 5403(A). Specifically, "340B drug" is defined to only include drugs "purchased by a covered entity." *Id.* § 5401(1). The only entities that can access the 340B discount are those permitted by federal law to purchase 340B drugs. Under state law, therefore, "[p]harmacies do not purchase 340B drugs, and they do not receive the 340B price discounts." *McClain*, 95 F.4th at

1144; *Murrill*, 2024 WL 4361597, at *14; *Fitch II*, 2024 WL 3503965, at *19.

Furthermore, the 340B Program is voluntary, so AbbVie's participation "can hardly be called a taking." *Monsanto*, 467 U.S. at 1007. AbbVie chooses to offer discounted drugs to 340B hospitals "in exchange" for the "valuable" "benefit" of selling drugs to the federal government. *Horne v. Dep't of Agric.*, 576 U.S. 350, 366 (2015) (citation omitted). Oklahoma "does not require AbbVie to sell its drugs in [Oklahoma] at all." *Skrmetti*, 2025 WL 1805271, at *19; *Murrill*, 2024 WL 4361597, at *15. AbbVie alleges that it agreed to certain conditions with the federal government, not with Oklahoma. Doc. 1, ¶ 149. But state laws addressing requirements for Medicare Part B and Medicaid participants do not change the choice to participate in the programs in the first place. It is *that* choice that "forecloses the possibility that the [state] statute could result in an imposed taking of private property." *Minn. Ass'n of Health Care Facilities v. Minn Dep't of Pub. Welfare*, 742 F.2d 442, 446 (8th Cir. 1984). Moreover, as the 340B Program "has had a well-known 'gap' about how delivery must occur since Congress enacted it[,]" it was "foreseeable to [AbbVie]" that "states might require Section 340B drugs to be distributed for dispensation at private pharmacies." *Fitch II*, 2024 WL 3503965, at *19; *Bailey*, 2025 WL 644285, at *6. Even the case AbbVie cites held only that a voluntary exchange does not exist when the "purported 'benefit' is illusory." *Valancourt Books v. Garland*, 82 F.4th 1222, 1232 (D.C. Cir. 2023). Here, AbbVie receives a "valuable benefit" by gaining access to the Medicare Part B and Medicaid markets. *Horne*, 567 U.S. at 366.

AbbVie's allegation that HB 2048 does not serve a public purpose is simply implausible. Doc. 1, ¶ 158. In arguing this, AbbVie faces a high hurdle: "[w]ithout exception, [the Supreme Court] ha[s] defined that concept broadly, reflecting [its] longstanding policy of deference to

legislative judgments." *Kelo*, 545 U.S. at 480. That private parties benefit from HB 2048 makes no difference. *Id.* at 485. What matters is that HB 2048 is "rationally related to a conceivable public purpose." *Haw. Hous. Auth. v. Midkiff*, 467 U.S. 229, 241 (1984). Here, it is. The "dispensation of 340B drugs at contract pharmacies advances public health." *Fitch II*, 2024 WL 3503965, at *20. The 340B program was designed to make covered entities more profitable, thereby stretching scarce federal resources farther. H.R. REP. 102-384, at 11–12. Under federal law, covered entities are not required to pass discounts on to patients. Instead, Congress created a system to provide long-term benefits to patients by making it more profitable for entities to serve underserved areas—thereby increasing healthcare capacity in those areas. Even treating AbbVie's allegations as true that Oklahoma covered entities are not passing discounts to patients, HB 2048 is still rationally related to the important public purpose of increasing healthcare capacity in rural and disadvantaged areas.

### B.  AbbVie has not plausibly alleged a regulatory taking.

AbbVie alternatively claims that HB 2048 effectuates a partial regulatory taking. Doc. 1, ¶ 160. AbbVie, however, declined to raise this claim in its preliminary injunction motion— a telling omission. Doc. 16 at 17–20. AbbVie's allegations on this front are not plausible.

The "paradigmatic taking" involves "direct government appropriation or physical invasion of private property." *Lingle v. Chevron USA Inc.*, 544 U.S. 528, 537 (2005). A regulatory taking is a different kind of taking. It stretches the Takings Clause beyond its text to include regulations that are "so onerous that [their] effect is tantamount to a direct appropriation or ouster." *Id.* When considering a partial regulatory taking claim, courts consider three factors "(1) the economic impact of the regulation on the claimant; (2) the extent to which the

regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action." *Murr v. Wisconsin*, 582 U.S. 383, 393 (2017). Determining when a regulation goes "too far" requires restraint. *Lingle*, 544 U.S. at 538. After all, "government regulation—by definition—involves the adjustment of rights for the public good." *Andrus v. Allard*, 444 U.S. 51, 65 (1979). AbbVie has not plausibly alleged a partial regulatory taking.

First, a "mere diminution in the value of property, however serious, is insufficient to demonstrate a taking." *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 645 (1993). Indeed, courts have held that diminutions of 75 percent and 92.5 percent have not been severe enough to warrant a taking. *Tenn. Scrap Recyclers Ass'n v. Bredesen*, 556 F.3d 442, 456 & n.6 (6th Cir. 2009). In the face of this precedent, AbbVie has only pled vague "significant financial losses." Doc. 1, ¶ 162. "Significant," even if true, is not enough.

Second, HB 2048 "is the foreseeable result of authorized government action." *Ark. Game & Fish Comm'n v. United States*, 568 U.S. 23, 39 (2012). As the pharmaceutical industry is "an industry that long has been the focus of great public concern and significant government regulation," enhanced regulation is foreseeable. *Monsanto*, 467 U.S. at 1008–09. And here, the federal 340B program "has had a well-known 'gap' about how delivery must occur since Congress enacted it[,]" which makes it "foreseeable to [AbbVie]" that "states might require Section 340B drugs to be distributed for dispensation at private pharmacies." *Fitch II*, 2024 WL 3503965, at *19; *Bailey*, 2025 WL 644285, at *6. AbbVie has not plausibly pled otherwise. Doc. 1, ¶ 162.

Third, the Act is a regulation that "arises from a public program that adjusts the benefits and burdens of economic life to promote the common good." *Connolly v. Pension Benefit Guar.*

*Corp.*, 475 U.S. 211, 225 (1986). The regulatory takings doctrine "aims to identify regulatory actions that are functionally equivalent to the classic taking in which the government directly appropriates private property or ousts the owner from his domain." *Lingle*, 544 U.S. at 539. HB 2048 does nothing of the kind. Oklahoma determined that covered entities would better serve their purpose if they were able to receive covered drugs at contract pharmacies. HB 2048 merely steps in and prohibits delivery restrictions that manufacturers were placing on those covered entities.

Accordingly, AbbVie has not plausibly pled that HB 2048 effects a regulatory taking.

## III.   HB 2048 IS NOT VAGUE.

AbbVie claims that HB 2048's statement that "[a] manufacturer shall not interfere with a pharmacy contracted with a 340B entity" is unconstitutionally vague. Doc. 1, ¶ 168 (quoting OKLA. STAT. tit. 36, § 5403(B)). AbbVie takes particular issue with the word "interfere." *Id.*, ¶ 169. AbbVie's claims do not remotely approach the high standard that the Supreme Court requires plaintiffs to meet to deem a law unconstitutionally vague. Thus, yet again, every court to rule on this claim at the preliminary injunction stage has rejected it. *See, e.g., Murrill*, 2024 WL 4361597, at 10–12; *Skrmetti*, 2025 WL 1805271, at *20–22. This Court should do the same.

A law is unconstitutional only if it "forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning." *Cramp v. Bd. of Pub. Instruction*, 368 U.S. 278, 287 (1961). This standard requires much more than establishing that there is some "difficulty in determining whether certain marginal offenses are within the meaning of the language under attack." *See e.g., Jordan v. De George*, 341 U.S. 223, 231 (1951); *see also Hejira Corp. v. MacFarlane*, 660 F.2d 1356, 1367 (10th Cir. 1981) ("the fact that different

22

minds may reach different results . . . does not render the statute void for vagueness"). "Language inevitably contains ambiguity[,]" but ambiguity alone does not make a statute unconstitutionally vague. *United States v. Solomon*, 95 F.3d 33, 35 (10th Cir. 1996). The burden for establishing vagueness is even higher when considering a civil law, such as this one, "because the consequences of imprecision are qualitatively less severe." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498–99 (1982). Similarly, the burden is higher for economic regulations because businesses can be expected to consult laws prior to acting. *Id.* And laws that do not implicate constitutionally protected conduct are not unconstitutionally vague unless "the enactment is impermissibly vague in all of its applications." *Id.* at 494–95.

"[R]ead in the context of the statute as a whole[,]" HB 2048 "provide[s] adequate notice of what conduct is prohibited and do[es] not invite arbitrary enforcement." *Skrmetti*, 2025 WL 1805271, at *21. Indeed, AbbVie's preemption and takings claims are premised on an understanding of what HB 2048 accomplishes. "The Act is targeted at precisely the conduct in which AbbVie . . . want[s] to engage in." *Id.* HB 2048 prohibits manufacturers from "impos[ing] restrictions on covered entities' access to 340B discounted drugs that are not expressly authorized by federal law." *Id.* That is not particularly complicated.

It matters little that "interfere" is not defined in the statute. The term first appears in subsection A, which provides that a "manufacturer shall not deny, restrict, prohibit, or otherwise interfere with, either directly or indirectly, the acquisition of a 340B drug by, or delivery of a 340B drug to a 340B entity, unless such receipt is prohibited by [HHS]." OKLA. STAT. tit. 36, § 5403(A). Under the *noscitur a sociis* canon of statutory construction, the word "interfere" must be interpreted in light of the other actions prohibited. *Murrill*, 2024 WL

23

4361597, at *10 (interpreting a similar provision). Therefore, the term "interfere" within HB 2048 "proscrib[es] actions that prevent or hinder the acquisition or delivery of Section 340B drugs to contract pharmacies." *Id.* Although subsection B does not contain the same list of words alongside "interfere," it is axiomatic that "identical words and phrases within the same statute should normally be given the same meaning." *Powerex Corp. v. Reliant Energy Servs., Inc.*, 551 U.S. 224, 232 (2007). That is to say, "interfere" in A means the same thing as in B.

AbbVie's reliance on *Carolina Youth Action Project v. Wilson*, 60 F.4th 770, 786 (4th Cir. 2023), does not affect this conclusion. Doc. 7 at 21. There, the statute made it a crime to "willfully or unnecessarily" "interfere with or to disturb in any way or in any place the students or teachers of any school or college in this State," "to loiter about such school or college premises," or "to act in an obnoxious manner thereon." *Id.* at 786. The differences between that law and HB 2048 are numerous; there are obvious problems with criminalizing "obnoxious" behavior at school that are not present here. Put differently, *Wilson*'s vagueness analysis focused on other words besides "interfere"—namely, "unnecessary disturbances, loitering, or obnoxiousness in schools." *Id.* And because that state statute was a criminal prohibition, it was held to "a stricter standard" than the civil law at issue here. *Id.* at 781.[4]

AbbVie has not offered a credible argument that it is likely to face criminal penalties for violating HB 2048. The Act authorizes exclusively civil penalties. OKLA. STAT. tit. 36, § 5404. AbbVie's citation to a different statute within the Oklahoma Insurance Code that states that "violation of any provision of this Code shall constitute a misdemeanor[,]" *id.* § 117, does

---

[4] AbbVie also complains that HB 2048 does not contain a scienter requirement. Doc. 1, ¶ 170. The State has previously addressed why this argument is mistaken. *See* Doc. 26 at 24 n.6.

not transform this civil statute into a criminal one. Among other things, AbbVie has not cited "any instances in which criminal charges were brought against a corporation for violation of the [Oklahoma Insurance Code]." *Skrmetti*, 2025 WL 1805271, at *10.

Finally, *Pullman* abstention should apply here. Under this doctrine, abstention is appropriate "in cases presenting a federal constitutional issue which might be mooted or presented in a different posture by a state court determination of pertinent state law." *S & S Pawn Shop Inc. v. City of Del City*, 947 F.2d 432, 442 (10th Cir. 1991). Three requirements must be met to justify abstention: "(1) an uncertain issue of state law underlies the federal constitutional claim; (2) the state issues are amenable to interpretation and such an interpretation obviates the need for or substantially narrows the scope of the constitutional claim; and (3) an incorrect decision of state law by the district court would hinder important state law policies." *Caldara v. City of Boulder*, 955 F.3d 1175, 1179 (10th Cir. 2020). This entire lawsuit is predicated on the interpretation and effect of a new state law. HB 2048 is not ambiguous. And the word "interfere" "is a term subject to reasonable interpretation by [] Oklahoma courts." *S & S Pawn Shop*, 947 F.2d at 442. With this federal pre-enforcement challenge, AbbVie has attempted to deny Oklahoma courts the ability to interpret HB 2048. An incorrect interpretation by a federal court would upend State regulation designed to protect healthcare in rural Oklahoma. This Court should abstain. Oklahoma courts can interpret Oklahoma law.

Accordingly, HB 2048 cannot be plausibly painted as vague. Dismissal is appropriate.

## **CONCLUSION**

Defendants respectfully request that this Court grant the State's Motion.

Respectfully submitted,

*s/ Will Flanagan*

GARRY M. GASKINS, II, OBA 20212
 *Solicitor General*
ZACH WEST, OBA 30768
 *Director of Special Litigation*
WILL FLANAGAN, OBA 35110
 *Assistant Solicitor General*
ADDISON GAUT, OBA 36457
 *Assistant Attorney General*

OFFICE OF ATTORNEY GENERAL
 STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
Phone:  (405) 521-3921
Garry.Gaskins@oag.ok.gov
Zach.West@oag.ok.gov
William.Flanagan@oag.ok.gov
Addison.Gaut@oag.ok.gov

*Counsel for Defendant*

26